## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES *ex rel.* DEBRA ) | |
| HOCKETT, M.D., *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Misc. No. 01-50 (RCL)** |
| **v.** ) | **Part of Civil Action No. 99-3311 (RCL)** |
| ) | |
| COLUMBIA/HCA HEALTHCARE ) | |
| CORP., *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

This case began its life in the Western District of Virginia, and was one of several matters transferred to this Court for consolidated and coordinated pretrial proceedings as part of a multi-district litigation. That litigation has seen some 30 lawsuits come through this Court, which have lasted ten years and spawned thousands of court filings. Only two of these cases remain, and this is one. Today the Court resolves all outstanding motions, dismissing some claims and granting summary judgment as to others. As this case is now almost ready for trial, the Court will order the submission of a joint pretrial statement and will schedule a pretrial conference, in an effort to help this case reach the point where it can be returned to the court from whence it came for trial.

## II. BACKGROUND

### 1. Factual History

The relator in this case, Chyrissa Staley, brings this *qui tam* suit under the False Claims

Act against Columbia/HCA Healthcare, its former subsidiary, Indian Path Hospital, Summit

Home Health, and Horizon Mental Health Management, for allegedly inflating costs at Indian

Path Hospital and other HCA-affiliated hospitals in order to defraud the federal Medicare

program.

The allegations revolve primarily around the Indian Path Hospital in Kingsport,

Tennessee.  Two of the original relators were doctors at Indian Path ("IPH"), while the third,

remaining relator, Chyrissa Staley, was a nurse there.[1]  As the year 1996 approached, IPH was

preparing to open a new unit in the hospital dedicated to the treatment of geriatric patients coping

with both mental and physical illness.  This geriatric/psychiatric unit, known colloquially as the

"geropsych" or "GP" unit, was in addition to the Indian Path Pavilion, an HCA-affiliated mental

health treatment facility that stood next to IPH.

IPH was to receive reimbursement from the federal Medicare program for patient-care

expenses at the GP unit under a special program known as "TEFRA," after the piece of

legislation that spawned it, the Tax Equity and Fiscal Responsibility Act of 1982.  The GP unit's

first year of operation ran from March 1, 1996 until February 28, 1997.  For that first year, IPH

was to bill Medicare each time a patient was discharged, by sending a UB-92 form that stated

how many days the patient stayed at the GP unit.  Medicare then reimbursed IPH at a per-day,

per-patient rate that the parties had previously negotiated.

At the end of the year, IPH submitted a cost report summarizing all of the GP unit's costs

for the year.  This report was something like a tax return, listing all of the reimbursable costs

---

[1]Hockett has since passed away, while Thompson's claims in this case were barred
because of her failure to list this cause of action in her bankruptcy estate.

incurred at the GP unit for the year.  Medicare would then reimburse IPH for all costs reflected in the report that had not yet been captured.  Most importantly, the cost report for the first year of operation would set the "target amount," "target rate," or "base" rate at which IPH would be reimbursed, per-day and per-patient, in future years, with periodic upward adjustments.  In its most basic terms, the cost report would report all costs, which would then be divided by the number of patient days, which would yield the new rate at which Medicare would reimburse IPH, per-patient and per-day, in future years.  The total cost of running the GP unit during the first year would be treated as the average cost.  "Under this system, hospitals were obligated to absorb operating costs in excess of their target amounts, but they received bonuses if their operating costs were less than their targeted amounts."  *Sacred Heart Medical Center v. Sullivan*, 958 F.2d 537, 540 (3d Cir. 1992) (summarizing operation of the TEFRA program).

According to the allegations in the Amended Complaint – the evidence in support of which is discussed more fully *infra* – the GP unit at Indian Path was halfway through the TEFRA base period when it was determined that the TEFRA rate was too low.  A scheme was hatched, or so it is alleged, to improperly inflate the TEFRA rate through a number of devices.  IPH made use of a management services company called Horizon, whose employee, Cynthia Culberson, set up shop in the GP unit as its director.  There she became a central player in the effort to raise the TEFRA rate.[2]  Culberson, allegedly acting with the knowing cooperation of Robert Bauer, Indian

---

[2]There is no serious debate here that IPH did try to raise its TEFRA rate and that achieving this goal was the principal task Horizon was brought in to accomplish.  But there are legitimate reasons why IPH's officers would want to raise the TEFRA rate higher than where it was during the first part of the target period.  It is quite possible that IPH was not adequately stocking the GP unit with supplies or making sure that it was incurring the necessary start-up costs or incurring the costs that it should reasonably expect to incur each year.  If that state of affairs had been allowed to persist, the TEFRA rate would have failed to reflect the actual,

Path's Chief Executive Officer, Jim Matney, its Chief Financial Officer, and Gail Peace, its Chief Nursing Officer, embarked on a scheme to inflate the GP unit's costs beyond what they normally would be.  For instance, it is alleged that these conspirators tried to keep patients in the unit longer than was necessary to treat them, and that they also recruited sicker patients to the unit or diverted them from the Pavilion in an effort to increase the average time each patient stayed (referred to generally as the "average length of stay" or "ALOS"), which would then increase total cost.

Defendants are also alleged to have ordered supplies and equipment for use in other departments at IPH, while billing them to the GP unit, thus inflating its costs under the TEFRA program even further.  There is evidence suggesting that a number of items were billed to the GP unit but actually intended for use in other departments of the hospital.  Stretchers seemed to be high on everyone's wish list under this ploy, although there also was a stray coffee pot and other items which were purchased for use elsewhere in the hospital but billed to the GP unit.  Relator also alleges that the GP unit raised its costs by unnecessarily using more costly contract employees or overtime workers, and other schemes.  The result of this plot is that, at the end of the TEFRA period, the GP unit's cost report reflected a state of affairs that was far from the

typical cost of caring for patients, with the result that IPH's periodic reimbursement rate in future years would be lower than its actual costs, thus impairing its ability to deliver quality care. Because there are legitimate alternate explanations for some of the conduct alleged to have occurred, it is important for relator to adduce evidence that defendants knowingly sought to inflate the TEFRA rate beyond what was actually necessary for patient care.  Allegations that supplies were charged to the GP unit but were sent to other units of the hospital clearly fit within this category.  Allegations that IPH manipulated its average patient profile are more novel but could also suffice if supported by sufficient evidence, on the theory that the cost report represented that the GP unit's costs were typical, when in reality the unit had actively recruited atypical patients, with the intention of reverting back to the average patient profile once the TEFRA period ended.

truth, representing to the government that the high costs were typical, were all incurred at the GP unit, and would occur again. This set the GP unit's reimbursement rate at a high level going forward. While Jim Matney was still the hospital's CFO, he allegedly said that the GP unit's costs during its TEFRA base year would have been some $325,000 lower had it not been for conscious efforts to bring the TEFRA rate up. Fisher Dep. at 32-33 [1220-12].

Once the TEFRA period was over, Medicare began reimbursing IPH at the new, higher reimbursement rate established during the TEFRA period. At this point, IPH moved to cut costs in the GP unit; for instance, the average length of stay plummeted, as did the use of contract workers. According to relator, this was the result of intentional conduct by IPH. Once the TEFRA period was over and the GP unit could be reimbursed at the new, inflated rate, its incentive was to slash costs so that its periodic reimbursement greatly exceeded its cost basis and, more importantly, so that IPH could reap the benefits of year-end bonuses for accruing costs well below its TEFRA rate, which was easy to do since the rate was inflated. The individuals responsible for the scheme had their own motives, both professional – for instance, Matney had been named a CFO of the Year within his hospital chain – and pecuniary – for instance, the top three officers at IPH stood to receive performance bonuses if the hospital qualified for the Medicare bonuses. *See* Peace Dep.

Before the year was out, Indian Path was revising its cost report and filing an amendment with the Medicare program, restating its costs downward by hundreds of thousands of dollars. Rumors of Medicare fraud at the facility led to internal and external investigations, and culminated in the firing of Bauer and Matney. The events at Indian Path gave rise to a number of lawsuits, including this one.

### 2. Procedural History

The original three relators brought this *qui tam* action under the False Claims Act in the fall of 1997, in the United States District Court for the Western District of Virginia.[3]  In 1999 the Judicial Panel on Multidistrict Litigatoin consolidated this suit in this Court for pretrial purposes, along with several other loosely related cases alleging various forms of Medicare fraud. Defendants are Indian Path Hospital itself; Superior Home Health of East Tennessee, Inc., which provided certain contract services for the GP unit; Horizon Mental Health Management, Inc., a health services company that essentially provided consulting assistance to the GP unit to achieve the optimal TEFRA rate during the target period; and Columbia/HCA Healthcare Corp.  As discussed more fully below, Columbia/HCA was, at the relevant times, the ultimate parent corporation of Indian Path, and operated a vast chain of health care facilities across the country.

As will also be seen below, the original complaint was amended once, adding the allegation that the kind of fraud that allegedly occurred at Indian Path's geropsych unit also occurred at other geropsych units at hospitals owned by Columbia/HCA.  The Court and parties have distinguished between the allegations in the original complaint, which are specific to Indian Path and have been called the "Phase I" allegations, and those added by the Amended Complaint, which speak to other Columbia/HCA facilities and have been called the "Phase II" allegations. The parties have proceeded through discovery, and a number of motions now confront the Court, grouped into four main substantive areas: (1) relator moves for suggestion of remand to the Judicial Panel for Multidistrict Litigation; (2) defendants challenge the Court's subject matter

---

[3]As discussed more fully *infra*, the False Claims Act allows private individuals to bring suit on behalf of the government where false claims have been submitted to the government for payment, and the private person, called a "relator," may share in any ultimate recovery.

jurisdiction over the Phase II claims; (3) Horizon and Columbia/HCA each seek summary

judgment on the grounds that they cannot be held liable for whatever happened at IPH; and (4)

defendants seek partial summary judgment that the UB-92 forms submitted by IPH for

reimbursement during the TEFRA period are not false claims for which defendants can be

assessed separate statutory penalties.  In short form, the Court holds as follows: (1) the motion

for suggestion of remand is denied; (2) the Court finds that it lacks subject matter jurisdiction

over the Phase II claims, by operation of statute; (3) there are genuine issues of material fact that

preclude summary judgment as to Horizon and HCA's liability for conduct at IPH; and (4) relator

has failed to adduce evidence sufficient to survive summary judgment for the individual UB-92

forms, because she has not identified any one that contains a false statement.

## III. HOUSEKEEPING

Before diving into the substance of the case, there are a number of housekeeping matters

with which to deal.  Relator's Motion [1191] to establish a briefing schedule on motions to

dismiss is DENIED because it has been mooted by the passage of time.  The parties' effort to

streamline briefing is commendable, but the briefing already has unfolded along other lines.

The other housekeeping motions seek to strike filings or seek leave to file surreplies, a

popular mode of advocacy in this case.  "A motion to strike is considered an exceptional remedy

and is generally disfavored, and the proponent of such a motion must shoulder a formidable

burden."  *United States ex rel. K&R Limited Partnership v. Massachusetts Housing Finance

Agency*, 456 F.Supp. 2d 46, 53 (D.D.C. 2006) (Lamberth, J.) (internal quotations and citations

omitted) (collecting authorities).  "The decision to grant or deny leave to file a sur-reply is

committed to the sound discretion of the court.  If the movant raises arguments for the first time

in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply." *Flynn v. Veazey Const. Corp.*, 310 F.Supp. 2d 186, 189 (D.D.C. 2004) (Urbina, J.) (internal citation omitted) (collecting cases).

Relator filed a Motion [1216] seeking leave to file a surreply to HCA's motion to dismiss, but relator's counsel did not certify that she had conferred with defense counsel on this non-dispositive motion.  This violates Local Civil Rule 7(m), which would be grounds for denying the motion.  Yet it seems that consultation would have been futile, since HCA filed an opposition, equal in length to the surreply at issue, which stated no reason for rejecting the surreply, other than it being untimely and unnecessary.[4]  That opposition brief was really just a rehash of HCA's argument in support of its motion to dismiss, and thus was in effect a sur-surreply, to which relator, for some reason, saw fit to reply, leaving this Court as the owner of what may be the world's first sur-sur-surreply, a position in which no Court should ever find itself.  Since relator's surreply responds to evidence first raised in HCA's reply, and because HCA identified no actual prejudice that would result from allowing the surreply, the Motion [1216] is GRANTED.

Relator herself filed a Motion [1224] to strike Horizon's reply memorandum [1222] in support of its motion for summary judgment, or in the alternate, for leave to file an ever-popular

---

[4]Other motions dealt with in this section also fail to comply with Local Rule 7(m).  The rule does not contain a futility exception, and it is always the best practice to consult even where the other party's opposition, as a general matter, is little more than a foregone conclusion. Consultation might still result in some narrowing of the issues, a consent to a surreply, or any number of solutions which might lead to fewer filings and facilitate the Court's focus on the merits.

surreply thereto.  Relator argues that Horizon introduced a wholly new theory for summary judgment in its reply brief, which is impermissible, and also that relator should be allowed to respond to Horizon's objections to the evidence relator offered in opposition to the summary judgment motion.  The Court agrees that Horizon's argument shifted slightly between the two briefs, such that a new argument seems to have emerged, to which relator should be allowed the opportunity for a full response.  Relator's Motion [1224] is DENIED in part and GRANTED in part.  It is denied insofar as the Court is loathe to strike a brief, especially when the better course is to grant the request for leave to file a surreply, so that a complete record may be considered.

Horizon has moved [1228] for leave to file a surreply to relator's reply to Horizon's opposition to relator's motion to strike Horizon's reply in support of its summary judgment motion.  Since the Court has just denied the motion to strike but accepted relator's surreply, Horizon is essentially seeking leave to file a sur-surreply, which of course, relator opposed, with Horizon responding to that opposition.  Since all of these responses argued the merits just as much as they argued why certain papers should or should not be accepted, the Court is left with something it never thought it would see, a sur-sur-sur-surreply (hereinafter, "reply[4]").  All of these papers, particularly the reply[4], add very little that is new, and do not respond to any improper argument.  We are now several steps removed from a substantive motion, and are faced only with filings about filings.  Eventually we reach a point where all this metapleading must stop, and this is that point.  The Motion [1228] is DENIED.

## IV.  SUGGESTION OF REMAND

Relator has filed a motion [1147] asking this Court to suggest to the Judicial Panel on Multidistrict Litigation ("MDL Panel" or "JPML") that this case be remanded to the transferor

court, the Western District of Virginia.  Relator seeks remand prior to the Court ruling on the motions to dismiss for lack of subject matter jurisdiction and for summary judgment.  The MDL Panel may, under 28 U.S.C. § 1407(a), transfer multiple actions to one district court for "coordinated or consolidated pretrial proceedings" when it determines that "such proceedings will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions."  The statute also commands that "[e]ach action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."  *Id.*

Relator argues that remand is appropriate at this time because "there are no longer any pretrial proceedings that need to be 'coordinated or consolidated,'" and the only other action that remains before this Court does not share any common parties or discovery with this case. Relator's Motion [1147] to Consider Suggestion Of Remand To The MDL Panel at 1.  Relator also argues that remand will serve judicial economy because resolution by the transferor court of certain issues remaining in the case will reduce the likelihood of duplicative appeals to both the District of Columbia and Fourth Circuits.  Defendants oppose remand, arguing that, at the time relator moved for it, discovery was still ongoing, and that this Court's experience with this case and the other MDL cases make it desirable to resolve all pre-trial matters here.[5]  For instance, the HCA defendants point out that motions for summary judgment in this case might have required interpretation of a settlement agreement in another case that came before this Court as part of the same MDL, and will in any event call on the general familiarity the Court has gained from these cases in dealing with the False Claims Act, allegations of Medicare and similar fraud in the

---

[5]Discovery has been completed since the motion seeking remand was filed.

healthcare industry, and the facts of this case in particular.

Only the MDL Panel may remand a case or cases transferred under § 1407; a district court sitting as transferee court lacks that power.  *In re Wilson*, 451 F.3d 161 (3d Cir. 2006).  While the MDL Panel will consider remand upon the suggestion of the transferee district court, the motion of any party, or on its own initiative, JPML Rule 7.6(c), "[t]he Panel is reluctant to order remand absent a suggestion of remand from the transferee district court," and a district court's suggestion of remand is typically given considerable weight.  JPML Rule 7.6(d).  In most cases, the Panel's decision to order remand, and the transferee court's decision to suggest it, are discretionary.  But in some circumstances, § 1407 commands the MDL Panel to remand a case, and if those circumstances applied here, the Court would be hard pressed to do anything but suggest remand.

The statute orders that a case "shall be remanded by the panel at or before the conclusion of such [coordinated or consolidated] pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."  28 U.S.C. § 1407(a).  Remand is thus mandatory if (1) the case has not been previously terminated and (2) coordinated or consolidated pretrial proceedings have concluded.  In all other cases, it is discretionary.

This case clearly has not been terminated.   Although discovery has been completed, pretrial proceedings still have not concluded, since "[p]re-trial, as an adjective, means before trial – . . . all judicial proceedings before trial are pretrial proceedings."  *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 494 (J.P.M.L. 1968).  This means that pretrial proceedings do not conclude until a final pretrial order is entered, and that all prior proceedings – including rulings on motions for summary judgment – are pretrial proceedings that may properly remain before the transferee court.  *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34

11

(1998) (including summary judgment motions when considering pretrial proceedings under §
1407); *In re Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 138 F.3d 695, 697 (7th Cir. 1998)
(stating that transferee judge has power to issue final pretrial order under F.R.C.P. 16; collecting
authorities); *In re Patenaude*, 210 F.3d 135, 144-45 (3d Cir. 2000) (reviewing legislative history
of § 1407 and other authorities and concluding that pretrial proceedings include summary
judgment).

Relator seems to suggest a third layer, implying that whatever pretrial proceedings may
remain, they have lost their nature as "coordinated or consolidated pretrial proceedings" because
there are no issues or parties in common between this case and the one other remaining in this
MDL.  This misunderstands the meaning ascribed to "coordinated or consolidated."  The
Supreme Court has made clear that cases may be coordinated, and thus serve the purposes of the
statute, even if all other cases have already been disposed of, so long as there is some "common
core" that makes it more just or efficient that the cases continue to be handled in one court or
before one judge.  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34
(1998); *see also In re Wilson*, 451 F.3d 161, 170 (3d Cir. 2006) ("'[A] proceeding that relates
only to a single individual's case or claim can nonetheless be coordinated,' as coordination can
be found even if common issues are present only in relation to cases that have already been
terminated.") (quoting *In re Patenaude*, 210 F.3d 135, 143 (3d Cir. 2000)); *Patenaude*, 210 F.3d
at 144 ("To be coordinated, it is not necessary that common issues are being contemporaneously
addressed."); *In re Evergreen Valley Project Litig.*, 435 F.Supp. 923, 924 (J.P.M.L. 1977)
(statute contemplates that transferee judge "in his discretion will conduct the common pretrial
proceedings with respect to the actions and any additional pretrial proceedings as he deems

12

otherwise appropriate.").

Defendants have identified several ways in which this case could and should be coordinated with other cases already handled as part of this multidistrict litigation, as well as the one other case that remains before the Court. *See Pogue v. Diabetes Treatment Centers of America*, Civil Action No. 99-3298. For instance, this Court is best situated to analyze certain legal and factual issues in this case because it has already dealt with them in others, including the cases against the HCA defendants and the other extant case, which does not involve HCA. There are thus several ways in which the treatment of this case can and is being coordinated with other cases that have come before the Court as part of this MDL, and the pretrial proceedings here thus remain "coordinated" as contemplated by 28 U.S.C. § 1407. Because the statute does not make remand mandatory in this case, the decision whether to suggest remand is in the Court's sound discretion.

In exercising that discretion, "[t]he transferee court should consider when remand will best serve the expeditious disposition of the litigation." Manual for Complex Litigation, Fourth, § 20.133. As § 1407 sets forth, the purpose of pretrial consolidation or coordination is "for the convenience of the parties and witnesses and [to] promote the just and efficient conduct" of the cases. 28 U.S.C. § 1407. This emphasis on fair and efficient case administration has been voiced by the courts as well, which have stated that the decision of whether to suggest remand should be guided in large part by whether one option is more likely to "insure the maximum efficiency for all parties and the judiciary." *In re IBM Peripheral EDP Devices Antitrust Litig.*, 407 F.Supp. 254, 256 (J.P.M.L. 1976). Efficient and fair resolution of certain issues is likely to "require any particular experience that the transferee judge might have gained from supervising

13

this litigation," and thus remand is premature.  *In re Multidistrict Civil Actions Involving the Air Crash Disaster Near Dayton, Ohio on March 9, 1967*, 386 F.Supp. 908, 909 (J.P.M.L. 1975); *see also In re Four Seasons Secs. Laws Litig.*, 361 F.Supp. 636 (J.P.M.L. 1973) (remand may be unwise where transferee court has gained expertise in issues important to the case, and where remand would simply duplicate those efforts).  In cases where remand has been deemed appropriate prior to the conclusion of all pretrial proceedings, there was no efficiency gain to be had by keeping the case before the transferee court.  *See, e.g., In re Baseball Bat Antitrust Litig.*, 112 F.Supp. 2d 1175 (J.P.M.L. 2000).

Many of the same reasons cited above in explaining why this case *could* still be coordinated with others leads the Court to conclude that it *should* still be coordinated.  This Court's familiarity with the issues in this case – a case which by now encompasses a voluminous docket – as well as the many related issues in the other cases in this MDL, indicates that it would be much more efficient to proceed to summary judgment motions in this Court rather than to ask the transferor court to play catch-up.  Relator claims that remand is appropriate because this case should be governed by the law of the transferor forum's circuit, the Fourth Circuit, which differs from the law of the D.C. Circuit.  Relator points to no authority supporting the proposition that remand is mandated by a circuit conflict.[6]  To the extent relator is simply seeking to avoid what it

_____

[6]The perceived conflict may be ephemeral, at any rate.  Relator contends that the Fourth Circuit requires that a relator's suit be "derived from" the relevant public disclosure in order to invoke the public disclosure jurisdictional bar, whereas in the D.C. Circuit the suit need only be "substantially similar" to the disclosure, such that the public disclosure trigger is easier to trip in the D.C. Circuit.  While the Supreme Court has not spoken directly to this issue, its recent opinion on the "original source" prong of the jurisdictional bar, *Rockwell International Corp. v. United States*, 127 S.Ct. 1397 (2007), strongly suggests that the D.C. Circuit's broader view of what constitutes a disclosure is correct, as that view is more demanding of relators and construes federal jurisdiction more narrowly.  Moreover, as demonstrated below, relator would likely lose

predicts will be this Court's application of the correct law, it has never been the case that dissatisfaction with the transferee court's rulings could support remand.  *In re Holiday Magic Secs. & Antitrust Litig.*, 433 F.Supp. 1125, 1126 (J.P.M.L. 1977).

Relator also had moved [1187] for an extension of time to oppose Horizon's motion to dismiss until after the Court ruled on the motion for suggestion of remand.  That motion is DENIED, not only because it has been mooted as events have unfolded, but also because it calls for MDL courts to adopt poor practices.  Relator essentially asked the Court to defer a ruling on whether it had subject matter jurisdiction over many of the claims in this case until after it had determined whether or not to suggest that the entire case be remanded.  This not only runs counter to general notions of subject matter jurisdiction, which dictate that a court cannot do anything with a case or part thereof unless it is first sure that it has jurisdiction over the subject matter, but it also is not in the best interest of judicial economy, which dictates that, as a general matter, MDL transferee courts should dispose of as many pretrial matters as possible before a case is returned to the trial court.

## V. SUBJECT MATTER JURISDICTION

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.[7]  At issue here is the public disclosure provision of the False Claims

---

her summary judgment argument even under the more lenient standard she advocates.

[7]Horizon sought to "conditionally withdraw" its separate motion after reaching an agreement with relator whereby it has been stipulated [1214] that paragraphs 36 and 37 of the Amended Complaint, which are the target of the 12(b)(1) motions to dismiss, apply to Horizon only insofar as they may relate to its conduct Indian Path, and that no claims are being asserted against Horizon as to other facilities.  The Court will construe the Amended Complaint in keeping with this stipulation.

Act, 31 U.S.C. § 3730(e)(4) ("FCA"), which cuts off subject matter jurisdiction over a relator's claims where the suit is "based upon the public disclosure of allegations or transactions," unless the relator can establish that he was an "original source of the information."  31 U.S.C. § 3730(e)(4)(A),(B).

Defendants contend that a news story published after the original complaint was filed, but before it was amended, publicly disclosed that fraud similar to that alleged at Indian Path may have occurred across the Columbia healthcare system.  Relators amended the complaint to allege fraud at other hospitals only after these public disclosures, defendants argue, and thus the jurisdictional bar applies.  Defendants also point out that substantially similar allegations were made in two *qui tam* actions in which the complaints remained under seal at the time the complaint in this action was amended.  Relator counters that there was no public disclosure because (1) she did not see the media articles and, at any rate, they did not disclose the same allegations she makes here; and (2) complaints that remain under seal cannot be public disclosures.  Even if there was a public disclosure, she argues, she is an original source, because of information conveyed to the government at the time the original complaint was filed.

## A. Applicable Law

While a transferee court sitting under § 1407 normally would apply the same law applied by the transferor court when sitting in diversity, *Van Dusen v. Barrack*, 376 U.S. 612 (1964), the transferee court should follow its own circuit on questions of federal law.  *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171 (1987), *aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).  "As a general rule, 'questions of federal law in MDL-transferred cases are governed by the law of the transferee circuit.'"  *In re M3Power Razor*

*System Marketing & Sales Practices Litig.*, 2007 U.S. Dist. LEXIS 2641 at *17, MDL No. 1704

(D. Mass. Jan. 11, 2007) (quoting *In re New England Mutual Life Ins. Co. Sales Practices Litig.*,

324 F.Supp. 2d 288, 297-98 (D. Mass. 2004)).  The Court thus applies the public disclosure rule

as construed by the D.C. Circuit, where not otherwise guided by the Supreme Court.

### B. The Complaints, Alleged Disclosures, and Procedural History

The original complaint was filed under seal on August 11, 1997.  At that time there were

three relators, Chyrissa Staley, Dr. Debra Hockett, and Dr. Linda Thompson.  Hockett is now

deceased and no longer a relator, and Thompson's claims were dismissed due to her failure to list

this suit in her bankruptcy estate.  *See* Mem. Op. & Order [989] (July 7, 2004).  The original

complaint alleged a fraudulent scheme at Indian Path Hospital, and no other facility.  On June 22,

1998, relators filed a First Amended Complaint.  Significantly, the Amended Complaint added

two paragraphs alleging Medicare fraud at HCA facilities other than Indian Path.  Paragraphs 36

and 37 allege:

> 36.    Upon information, defendant Columbia conducted one or more meetings of chief
> financial officers (CFOs) and certain other officials of the hospitals it owned
> and/or operated which had Geropsych units.  Jim Matney, CFO of Indian Path,
> attended on behalf of his hospital.  There, Matney and his counterparts were
> instructed in the use of, and told to use techniques that would inflate the TEFRA
> charges in their respective Geropsych units.
>
> 37.    Still upon information, these Geropsych units, acting in accordance with
> Columbia's instructions, employed these techniques and perhaps others for
> inflating TEFRA charges and as a result overcharged Medicare at the subject
> hospitals.  The overcharging techniques included those which are described in
> paragraphs 15 through 35 of this Complaint.

On December 18, 1997, after the original complaint was filed but before the above

amendments were made to allege fraud beyond Indian Path, the *New York Times* ran an article

outlining a detailed investigation of Medicare fraud at HCA hospitals.  The article is discussed more fully *infra*.

This Court has dealt with prior invocations of the public disclosure bar in the manner appropriate to the stage of the proceedings.  *See, e.g.*, Mem. Op. & Order [39 in 99-3311 Docket] (Apr. 23, 2004); Mem. Op. & Order [989] (July 7, 2004).[8]  But the Court also has made clear that motions challenging subject matter jurisdiction may be made or renewed until judgment is entered.  Mem. & Order [1169] (June 2, 2006).

### C. Public Disclosure Bar and Original Source Exception

### 1. In General

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, prohibits false or fraudulent claims for payment to the federal government, § 3729(a), and permits civil actions based on such claims to be brought by the Attorney General, § 3730(a), or by private individuals acting in the government's name, § 3730(b)(1).[9]

But § 3730(e)(4)(A) of the Act provides that:

> no court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government

---

[8]The first order denied Phase II discovery requests which were based on public disclosures; the second declined to invoke the public disclosure bar against paragraphs 36 and 37 of the amended complaint based on the record at that time.  The public disclosures cited by defendants were from June of 1998 and dealt only with allegations of fraud at Indian Path.  The public disclosure at issue here deals with fraud across the Columbia/HCA network.

[9]When an individual brings the suit in the government's name, the individual is known as a "relator," and her action is a "*qui tam*" suit.  *Qui tam* is shorthand for "*qui tam pro domino rege quam pro se ipso in hac parte sequitir*," meaning "who pursues this action on our Lord the King's behalf as well as his own."  *Rockwell Int'l Corp. v. United States*, 127 S. Ct. 1397; 167 L.Ed. 2d 190, 200 n.2 (2007).

Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

An "original source" is defined as:

an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

3730(e)(4)(B).

The jurisdictional inquiry proceeds in two steps, each with two subsidiary prongs of its own.  First, the court must determine that: (1) there has been a public disclosure of allegations or transactions; and (2) that the lawsuit is based upon the public disclosure of allegations or transactions.  Second, if there is a public disclosure, the court must determine whether the relator is an original source, meaning one who: (1) has direct and independent knowledge of the information and (2) voluntarily provided that information to the government before filing the action.[10]

The jurisdictional bar aims mainly at stopping parasitic suits, but "the blocking of freeloading relators who copy their complaints directly from public disclosures is not the FCA's only concern.  From its inception, the *qui tam* provisions of the FCA were designed to inspire whistleblowers to come forward promptly with information concerning fraud so that the government can stop it and recover ill-gotten gains.  Once the information is in the public

_____

[10]Elsewhere, this Court has described the inquiry as a three-step process, condensing the two aspects of the original source inquiry.  *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 2007 U.S. Dist. LEXIS 17664 at *13 (Mar. 14, 2007).  As this case shows, however, both prongs – having direct, independent knowledge and voluntarily providing information to the government – are of equal vitality and failure to satisfy either will result in a lack of jurisdiction.

19

domain, there is less need for a financial incentive to spur individuals into exposing frauds. Allowing *qui tam* suits after that point may either pressure the government to prosecute cases when it has good reasons not to or reduce the government's ultimate recovery." *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 685 (D.C. Cir. 1996).  In other words, "[t]hese jurisdictional requirements serve to ensure that the Act's rewards are available only where, at the time the *qui tam* claims were filed, the federal government was not already 'on the trail' of the alleged wrongdoing." *United States ex rel. Ervin & Assocs. Inc. v. The Hamilton Secs. Group, Inc.*, 370 F.Supp. 2d 18, 37 (D.D.C. 2005) (Oberdorfer, J.).

As the D.C. Circuit has noted, it must be emphasized that the first step in the public disclosure/original source analysis is to "ascertain whether the 'allegations or transactions' upon which the suit is based were 'publicly disclosed' in a 'criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit or investigation, or from the news media." *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994) (internal citations omitted) (hereinafter *Springfield Terminal*).  If there is no public disclosure or the suit is not based on publicly disclosed information, there is no need to proceed further, and jurisdiction is appropriate.  "If – and only if – the answer to the first question is affirmative, will the court then proceed to the 'original source' inquiry, under which it asks whether the *qui tam* plaintiff 'has direct and independent knowledge of the information on which the allegations are based.'  Under these circumstances, if the *qui tam* plaintiff qualifies as an original source, the action may proceed; if she does not, the action is barred." *Id.*

### 2. *Rockwell International*

The Supreme Court has recently provided guidance on the application of the public disclosure/original source rule, in *Rockwell International Corp. v. United States*, 127 S.Ct. 1397 (2007).  Though the case only deals directly with the second, original source component of the statutory analysis, it nonetheless speaks to the statute's application as a whole.

In *Rockwell* the relator, Stone, had worked at a nuclear facility operated by Rockwell in the 1980s.  In 1986, Stone was laid off, and in June of 1987 he went to the FBI, alleging that a number of environmental crimes were committed at the facility while he worked there, and providing the FBI with 2,300 pages of documents related to these charges.  *Id.* at 199-200. Among the documents was a 1982 engineering report containing Stone's assessment of a proposed waste treatment process that Rockwell was considering.  *Id.* at 200.  In short, the process was called "pondcrete," and involved mixing hazardous waste sludge with concrete into a mixture that was sufficiently solid that it could be stored and disposed of in blocks.  *Id*. at 199. Back in 1982, Stone had predicted that a piping system used to make the pondcrete would be ineffective and fail.  *Id.*  When he went to the FBI Stone did not point out this report, buried among the other documents, or orally tell the FBI about his pondcrete concerns.[11]  *Id.* at 200.

It turned out that there were problems with the pondcrete, but of a different nature.  *After* Stone was laid off at Rockwell, the company learned that pondcrete blocks were insolid, and by 1988 the Department of Energy also learned of this, when several blocks began leaking waste, which in turn led to the revelation that there were thousands of insolid blocks at the facility.  *Id.* at 199.  By the spring of 1988 the media had reported these findings, and it was the media's

---

[11]Stone claimed that he did tell the FBI, but the district court "found that he failed to establish that fact."  *Rockwell*, 167 L.Ed. 2d at 200 n.1.

explanation that the root of the problem was "Rockwell's reduction of the ratio of concrete to sludge in the mixture," not the piping system that Stone had predicted would go wrong. *Id.*

"Based in part on information allegedly learned from Stone," the FBI and EPA raided the Rockwell facility on June 6, 1989. *Id.* at 200. The affidavit in support of the search warrant alleged, *inter alia*, that Rockwell had used an "inadequate waste-concrete mixture" in the pondcrete blocks, rendering many insolid, and the media reported this allegation. *Id.* In July of the same year, Stone filed a *qui tam* suit under the FCA, alleging that Rockwell was obligated to comply with certain environmental laws, that it had failed to do so, and that in order to induce the government to make payments to Rockwell under its contract, the company had presented false and fraudulent claims. *Id.* at 200-201. Of the 26 environmental and safety issues mentioned in the complaint, one involved pondcrete, and reiterated Stone's claim that after his 1982 review of the design for the pondcrete process, he had predicted that the piping system would lead to problems. *Id.* at 201.

After the government intervened, Stone and the government filed an amended complaint, which maintained the allegation that Rockwell violated environmental laws by storing leaky pondcrete, but dropped the allegation that it was due a piping system defect. *Id.* These allegations were refined even further in a statement of claims that superseded the amended complaint, which added further details of events that allegedly gave rise to liability for the pondcrete problem, all of which occurred after Stone left Rockwell's employ, and none of which involved his previous piping system allegations. *Id.*

The jury returned a verdict finding Rockwell liable for claims covering the pondcrete allegations, which spanned from April 1, 1987 to September 30, 1988, and found for Rockwell

on all other claims.  *Id.* at 202.  After the verdict, Rockwell moved to dismiss under § 3730(e)(4).

Stone conceded that his successful claims were based on publicly disclosed information, but

argued he was an original source.  After a few iterations, the District Court held that Stone had

not disclosed his information to the government prior to filing his *qui tam* suit, because the 1982

engineering report was insufficient to communicate the pondcrete allegations, and because Stone

did not present sufficient evidence that he had orally informed the FBI about these allegations.

*Id.*  The Tenth Circuit disagreed, holding that the 1982 engineering report *was* a sufficient

disclosure to the government.

The Supreme Court in turn reversed, holding that the report was indeed insufficient.  The

Court first emphasized that § 3730(e)(4) is a subject matter jurisdiction provision.  *Id.* at 203-

205.  It then proceeded to the original source inquiry, since it was conceded that the suit was

based upon publicly disclosed allegations.  The Court pointed out that "the 'information' to

which subparagraph [3730(e)(4)](B) speaks about is the information upon which the relators'

allegations are based," meaning that the inquiry should not focus on whether the relator was the

source of the public disclosure, but rather whether he is a source of the information underlying

his own suit.  *Id.* at 205.

The Court next grappled with the phrase "information on which the allegations are

based," holding that "the term 'allegations' is not limited to the allegations of the original

complaint."  *Id.* at 206.  Because the statute only speaks of the relator's "allegations *simpliciter*,"

it is not limited to the allegations in the original complaint, so that "new allegations regarding a

fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction."  *Id.*

In other words, jurisdiction must be evaluated as to each distinct claim in a suit, and each must be

capable of surviving if brought as a stand-alone action.[12]

The Court then proceeded to a determination that Stone failed to qualify as an original source. As Stone and the government had alleged in the case they tried, during the relevant time period, Stone did not work at Rockwell, and therefore did not *know* anything about the problems that occurred there, with pondcrete or anything else. His prediction that the pondcrete process would not work because of a piping system flaw did not qualify as "direct and independent knowledge." Stone "did not *know* that the pondcrete failed; he *predicted* it," and "[e]ven if a prediction can qualify as direct and independent knowledge in some case (a point we need not address), it assuredly does not do so when its premise of cause and effect is wrong." *Id.* at 208. Stone's premise was wrong because the flaw he predicted in the piping system never came to pass; the system worked, and it was a different problem, unforeseen by Stone, that led to the leaky pondcrete. Stone's "knowledge" was so insubstantial as to count as no knowledge at all.

Stone argued that because he was an original source as to some of the claims that went to trial, the court had jurisdiction over all of them, including the pondcrete claims. The Supreme Court rejected that argument, holding that § 3730(e)(4) "does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. We, along with every court to have addressed the question, conclude that § 3730(e)(4) does not permit such claim smuggling." *Id.* at 209 (*citing United States ex rel. Merena v. Smithkline Beecham Corp.*, 205 F.3d 97 (3d Cir.

---

[12]To the extent the Court's July 7, 2004 Memorandum and Order [989] conducted its public disclosure/original source inquiry by reference only to the date the original complaint was filed, *Rockwell* makes clear that separate attention should have been paid to the date of the Amended Complaint, which added distinct claims. A different, earlier alleged disclosure is at issue here, dealing directly with allegations of fraud across the Columbia/HCA system, and the Court will focus on the record as it stands, rather than revisiting its prior decision.

2000) (Alito, J.); *Hays v. Hoffman*, 325 F.3d 982, 990 (8th Cir. 2003); *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1415-1416 (9th Cir. 1992)).

While *Rockwell* does not deal directly with the first prong of the statutory analysis, i.e., whether a suit is based on a public disclosure, it does provide some guidance in conducting that inquiry.  First, it emphasizes that the separate claims in a case must be analyzed distinctly, such that it is possible for one to be publicly disclosed while another is not.  Second, *Rockwell* reiterates that the public disclosure/original source bar is a matter of subject matter jurisdiction. This lends credence to those courts which have read the public disclosure prong broadly, as a quick trigger, and the original source prong searchingly, because this mode of analysis construes the jurisdiction under the statute narrowly, and jurisdictional provisions are to be construed narrowly.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).

### D. Analysis

The original Complaint only alleged wrongdoing at IPH.  Our jurisdictional inquiry focuses on the "Phase II" allegations, added in paragraphs 36 and 37 of the Amended Complaint. These are "new allegations regarding a fundamentally different fraudulent scheme," and thus "require reevaluation of the court's jurisdiction."  *Rockwell*, 167 L.Ed. 2d at 206.  As *Rockwell* makes clear, the new, distinct claims that relator seeks to add by amendment must satisfy the jurisdictional requirements as if they had been brought as a stand-alone suit.  Therefore, the Court must satisfy itself that the allegations added to the Complaint via amendment were not based on a public disclosure, or that if they were, that relator qualifies for the original source exception as to those claims.

"The federal courts are courts of limited jurisdiction, having only those powers assigned

to them by Congress or directly by the Constitution." *Daniels v. Union Pacific RR Co.*, 480

F.Supp. 2d 191, 194 (D.D.C. 2007) (citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511

U.S. 375, 377 (1994)).  On a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction,

where the Court's power to hear a claim is at issue, the plaintiff bears the burden of establishing

that the court has subject-matter jurisdiction, the Court "must give the plaintiff's factual

allegations closer scrutiny" than they would receive on a 12(b)(6) motion for failure to state a

claim, and the Court may look to matters outside the pleadings.  *Flynn v. Veazey Const. Corp.*,

310 F.Supp. 2d 186, 189-190 (D.D.C. 2004) (Urbina, J.) (collecting cases on legal standard for

12(b)(1) motion to dismiss).  In a case such as this, where there has been discovery, the plaintiff

must establish subject matter jurisdiction by a preponderance of the evidence, typically either at a

pretrial hearing or at trial itself, and the court may resolve disputed evidence.  *See, e.g., Erby v.

United States*, 424 F.Supp. 2d 180, 182-83 (D.D.C. 2006) (Friedman, J.); *Volkswagenwerk

Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).  As developed

more fully below, the question of subject matter jurisdiction is capable of resolution at this time

based on the record before the Court.

### 1.  Public Disclosure

"The public disclosure prong of § 3730(e) has two discrete criteria: there must be a

'public disclosure of allegations or transactions;' and the *qui tam* suit must be 'based upon the

public disclosure.'"  *United States ex rel. Schwedt v. Planning Research Corp., Inc.*, 39 F.Supp.

2d 28, 31 (D.D.C. 1999) (Oberdorfer, J.).  These inquiries seek to serve the FCA's "two basic

goals: 1) to encourage private citizens with first-hand knowledge to expose fraud; and 2) to avoid

civil actions by opportunists attempting to capitalize on public information without seriously

contributing to the disclosure of the fraud." *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 552 (10th Cir. 1992) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir. 1991)).  Because the new claims added by the Amended Complaint must be able to stand on their own, a public disclosure has the potential to bar relator's claims as long as it occurred before relator amended her complaint; the disclosure need not pre-date the original complaint.

### a. Requirement of Public Disclosure

First the Court must assess whether there has been a public disclosure at all of the sort contemplated by the statute.  The statute recognizes "public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A).  Courts have construed the definition of "public disclosure" somewhat broadly, such that it is sufficient that "the general practice has already been publicly disclosed." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1991).  *See also* Mem. Op. & Order [39 in Docket 99-3311] (Apr. 23, 2004) at 4 ("The level of public disclosure necessary to trigger the bar is relatively low, may be general in nature, and a realtor's ability to provide more specific information than that relayed by the public disclosure is irrelevant.") (citing *Findley* at 687); *Schwedt*, 39 F.Supp. 2d at 33 (citing *Findley*, 105 F.3d at 688)).

### i. Prior Qui Tam Actions

Defendants argue that two prior *qui tam* cases, filed under seal in the District of Columbia

District Court, disclosed the general scheme at issue here.  *See United States of America ex rel. Alderson v. Columbia/HCA Healthcare Corp.*, Civil Action No. 99-3290 (D.D.C.); *United States ex rel. Schilling v. Columbia/HCA Healthcare Corp.*, Civil Action No. 99-3289 (D.D.C.).  These complaints were not unsealed until after the complaint in this case was amended.

It has been established that a "civil hearing" encompasses pleadings and other materials filed in civil litigation, and not just live "hearings" in open court, so long as the paper matter is not subject to a protective order.  *See, e.g., Springfield Terminal*, 14 F.3d at 652 (holding that "discovery material, when filed with the court (and not subject to protective order) is 'publicly disclosed' in a 'civil hearing'" for FCA purposes); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993); *United States ex rel. Grayson v. Advanced Management Technologies, Inc.*, 221 F.3d 580, 582 (4th Cir. 2000) (finding public disclosure where administrative agency "filing was not under seal and the document was available upon request"); *Stinson*  944 F.2d 1149, 1155; *Findley* at 686.  All of this authority suggests that documents whose disclosure *is* restricted by a court – such as a sealed *qui tam* complaint, which has yet to even be served on the defendant – do not qualify as public disclosures.  Defendants have not identified any case that clearly stands for the opposite position.

Allowing a sealed *qui tam* complaint to act as a jurisdictional bar is not only counterintuitive – a sealed document is definitionally not public and thus a poor candidate as a "public disclosure" – but also does not serve the purposes aimed at by this provision of the FCA. The public disclosure/original source dichotomy seeks to encourage relators to come forward with useful information, but to disallow parasitic suits where the relator has done little more than record in a lawsuit what can be heard in the public domain.  But where a complaint is sealed, a

relator cannot know what allegations are contained therein, or that her services in exposing a fraud are not needed.[13]   The Court holds that a sealed *qui tam* complaint, of which a relator has no knowledge, is not a public disclosure for purposes of § 37370(e)(4).

   *ii. Newspaper articles*

   The other alleged public disclosure is a *New York Times* article that appeared in December of 1997, after the original complaint was filed but six months before it was amended to broaden the allegations beyond IPH.   *See* Kurt Eichenwald, "Health Care's Giant: Artful Accounting – A special report; Hospital Chain Cheated U.S. On Expenses, Documents Show," *New York Times* (Dec. 18, 1997) at A1.   The article, which purports to be based on a nearly two-year investigation by the *Times* of a substantial number of Columbia facilities, and which relies on a review of thousands of documents, describes a system of fraud, suggests that it is pandemic across the Columbia system, and gives a handful of examples of specific facilities in Tennessee and other states, and techniques used to perpetrate the fraud.   The report is clearly the type of "public disclosure . . . from the news media" that the statute has in mind.   § 3730(e)(4)(A).   It also predates the amendment of the complaint, so the operative paragraphs of the Amended Complaint could be "based upon" this public disclosure.   The question then is whether relator's lawsuit is indeed "based upon" the allegations or transactions in the article.

   *b. "Based upon ... allegations or transactions"*

---

   [13]As the D.C. Circuit has recognized, when Congress passed the 1986 amendments to the FCA, which installed the current public disclosure/original source provision, it changed the statute's focus from "evidence of fraud inside the government's overcrowded file cabinets to fraud already exposed in the public domain."  *Findley*, 105 F.3d 675, 684.

The FCA provides that "no court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions." 31 U.S.C. § 3730(e)(4)(A). As the D.C. Circuit has noted, "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed. When, as here, *some* information relied upon by the *qui tam* plaintiff is undeniably in the public domain, the task of ensuring that *qui tam* suits are limited to those in which the relator has contributed significant independent information can prove tricky." *Springfield Terminal*, 14 F3d. at 653.

The courts of this Circuit have navigated that tricky landscape by holding that a relator's lawsuit is "based upon" a public disclosure if it is "supported by" or is "substantially similar" to the allegations or transactions contained in the disclosure; it does not need to actually be "derived from" the public disclosure. *Findley*, 105 F.3d at 682; *see also Schwedt*, 39 F.Supp. 2d at 34. The reason for this broad interpretation of the jurisdictional bar is to strike a balance between providing incentives for *qui tam* suits while shutting out "civil actions brought by opportunists who do not contribute anything significant to the exposure of the fraud." *Findley* at 682. Case law in the D.C. Circuit is in line with the Tenth Circuit's observation that "the threshold 'based upon' analysis is intended to be a quick trigger for the more exacting original source analysis." *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 552 (10th Cir. 1992). A subsequent lawsuit is "based upon" a prior public disclosure if "the general practice has already been publicly disclosed." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1991).

"Allegation," as used here, "connotes a conclusory statement implying the existence of

provable supporting facts." *Springfield Terminal* at 653-54. "Transaction," on the other hand, "suggests an exchange between two parties or things that reciprocally affect or influence one another." *Id.* at 654. The D.C. Circuit has illustrated the meaning of this phrase by way of a formula:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain. ... [W]hen X by itself is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc only suffers when the whistleblower's suit is banned. When X *and* Y surface publicly, or when Z is broadcast, however, there is little need for *qui tam* actions, which would tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue. ... [Q]ui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z). When either of these conditions is satisfied, the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for *qui tam* suits.

*Springfield Terminal* at 654.

The Court looks first to what is alleged for the first time in the Amended Complaint, and then to the public disclosure, to determine if the former is "supported by" or "substantially similar" to the latter.

Paragraphs 36 and 37 of the Amended Complaint allege that Columbia held one or more meetings at which Indian Path CFO Jim Matney and "certain other officials" of Columbia facilities that had geropsych units were instructed in and "told to use techniques that would inflate the TEFRA charges in their respective Geropsych units." 1AC ¶ 36. The Amended

Complaint alleges that other, unspecified Columbia geropsych units used the same techniques as the Indian Path unit for defrauding Medicare, and "perhaps others." *Id*. ¶ 37.  The difference between the complaint as originally filed and as amended boils down to two points that were added via amendment: (1) that some of, or perhaps all of, the things alleged in the rest of the complaint happened at other, unspecified Columbia facilities; and (2) that Matney attended a meeting with officials of other Columbia facilities at which TEFRA-inflation techniques were discussed.

Turning to the public disclosure, the *New York Times* article, it alleged that certain specific Columbia facilities had engaged in certain specific techniques for defrauding Medicare. The article also alleged that many other facilities, not named therein, had engaged in similar fraudulent practices.  Likewise, the article described a number of other fraudulent techniques without tying them to specific facilities.  The article made clear that it was based on a *Times* investigation spanning almost two years and involving the review of thousands of pages of Columbia documents.

The *Times* article is a public disclosure of the allegation of fraud across the Columbia system, as well as of certain fraudulent transactions that support that general allegation.  In the lexicon of *Springfield Terminal*, the article disclosed one big "Z" and a laundry list of "Xs" and "Ys," the "essential elements" of fraud, and suggested that many more details of fraudulent transactions were supported by the volumes of information uncovered in the investigation.  A number of the fraudulent devices cited by the *Times* are similar to ploys allegedly used at Indian Path, such as billing supplies to certain cost centers where they were not actually used, and the improper use of contract employees.

32

The Court holds that relator's "Phase II" claims, the causes of action asserted by paragraphs 36 and 37 of the Amended Complaint, are "based upon" a prior "public disclosure" for purposes of the False Claims Act.  The new allegations are based upon the *Times* disclosure of the "allegation" that Medicare fraud occurred across the HCA system, not just at IPH.  The public disclosure bar kicks in where "the general practice has already been publicly disclosed." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1991).

Stripped to their essence, the two new paragraphs in the Amended Complaint merely state that, on information and belief, something like what happened at IPH happened elsewhere in the HCA system, and that, on information and belief, HCA held at least one meeting for officials at hospitals with GP units, where instruction was given on techniques for inflating TEFRA rates. This is highly similar to *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214 (D.C. Cir. 2003), which applied the FCA's first-to-file rule, with its identical "based upon" analysis.  Under *Hampton*, a suit is "based upon" earlier allegations where the "same material elements" are at issue, and there need not be an identity of facts.  *Id.* at 218.  A relator's suit is "based upon" prior allegations where it consists of "merely variations on the fraud [that a prior] complaint described."  *Id*.  There, as here, the relator took a broad allegation of fraud and simply narrowed it.  But since the whole cat was out of the bag, it did relator no good to focus on a smaller part of it.

Also on point is *Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir. 1992), a public disclosure case where the relator's complaint was merely "a rehash of what already has been publicly disclosed" and simply "repeats what the public already knows," while adding only slight details to the same general allegation that had been publicly disclosed; in that case, "that serious

problems existed with the Bradley [fighting vehicle]'s transmission." *See also id.* at 1418 ("*Qui tam* suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime.  In such a scheme, there is little point in rewarding a second toot.").

Relator fails in her attempts to argue that her amendments could not be based on the *Times* article because hers is a suit about TEFRA cost inflation, a theory not even mentioned by the *Times*.  It is not necessary that a public disclosure contain every detail of the alleged fraud so long as it contains the basic allegation of fraud.  For instance, in *Findley* it was enough that the public disclosure outlined the general fraudulent scheme – the relator's suit was still based on the public disclosure even though it added the who, when, and where of one specific instance of a fraud that had been generally described in the public disclosure.  That the Amended Complaint in this case differs in some ways from the public disclosure does not change the fact that paragraphs 36 and 37 "repeat[] what the public already knows."  *Findley*, 105 F.3d at 683; *see also Schwedt*, 39 F.Supp. 2d at 33-34 (inclusion of additional charges in complaint does not preclude conclusion that it is based on public disclosure); *cf. United States ex rel. Tillson v. Lockheed Martin Corp.*, 2004 U.S. Dist. LEXIS 22246 (2004 W.D. Ky.) (suit was not based on public disclosure where the place at issue was the same, but the alleged fraud at that place was completely different from that alleged in the public disclosure).

The parties make too much about the fact that the *Times* article went into detail on the concept of reserve cost reporting, a concept to which one of relator's experts referred in his deposition.  Reserve cost reporting is not itself a method of fraud, but rather one way in which fraud could be inferred or that the extent of a proven fraud could be determined.  Relator seems to argue that reserve cost reporting is a distinct legal theory from TEFRA cost inflation.  This

would not change the fact that relator's amendments are based on the general disclosure in the *Times* that there was Medicare fraud at Columbia units other than Indian Path and the specific disclosures of similar fraudulent methods, because "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed."  *Findley* at 688; *see also Schwedt* at 34 (slight variations in legal theory cannot salvage complaint clearly based on transactions and allegations that were publicly disclosed); *Springfield Terminal* at 655; *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995) (different legal theory does not redeem complaint based on same allegations).  But the reality is that neither of these – reserve cost reporting or TEFRA cost inflation – is even a legal theory.

This is not a case where a relator "started with innocuous public information," then "bridged the gap by its own efforts and experience" by "complet[ing] the equation with information independent of any preexisting public disclosure."  *Springfield Terminal* at 657.  To the contrary, it is well established that "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar."  *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) (citing *Findley*, 105 F.3d at 687-88).  *See also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991) ("The relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation.").  Where, as here, a relator merely adds slight details and variations to a publicly disclosed fraud, that relator's complaint is based upon the

public disclosure for purposes of § 3730(e)(4).

**2. Original Source**

Having determined that relator's suit is based upon a public disclosure, this Court is without jurisdiction over the claims asserted in paragraphs 36 and 37 of the Amended Complaint unless it can find that relator is "an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Two important observations merit attention at the outset: (1) the relator must be an original source for the allegations added to the Amended Complaint, which cannot be saved by her status as an original source for the original Complaint; and (2) the two prongs of the original source inquiry are of equal vitality, and a relator who can show direct and independent knowledge must also show that she voluntarily provided information to the Government prior to amending the Complaint.[14]

> *a. "direct and independent knowledge of the information on which the allegations are based"*

---

[14]Though the cases do not suggest a definitive answer in either direction, it also appears that relator must establish that she herself was an original source as to the new allegations in the Amended Complaint, regardless of whether either or both of her original co-relators would qualify as such. First, § 3730(e)(4)(B) speaks of an "individual" who qualifies as an original source. Second, *Rockwell*'s willingness to parse the distinct claims in a complaint, as well as the successive amendments, strongly indicate that each party who wishes to bring a *qui tam* suit must be able to invoke the court's jurisdiction. To do otherwise would be to permit the kind of "claim smuggling" – or in this case, party smuggling – that *Rockwell* forbids. Third, the other relators are no longer in the case, so it would be especially anomalous to permit Staley to invoke jurisdiction where no individual remains in the case who would be entitled to original source status. However, the Court finds that it is not vital to reach this question in this case. The Court has reviewed the entire record in this matter, and it is satisfied that none of the relators are original sources as to the claims added by paragraphs 36 and 37 of the Amended Complaint.

36

*Rockwell* also clarified that the "information" at issue is "the information upon which the relators' allegations are based." *Rockwell*, 167 L.Ed. 2d at 205. Therefore the inquiry is not about whether relator was a source of the *Times* article, but whether she had direct and independent knowledge of the information underlying her own amended allegation of fraud beyond Indian Path.

This "impose[s] a conjunctive requirement – direct *and* independent." *Springfield Terminal* at 656. The word "direct," as used here, "signifies 'marked by absence of an intervening agency.'" *Id.* (quoting *Stinson*, 944 F.2d at 1160). The distinct phrase "independent knowledge" stands for "knowledge that is not itself dependent on public disclosure," *id.* (citing *Houck v. Folding Carton Admin. Committee*, 881 F.2d 494, 505 (7th Cir. 1989)), which means the relator must have "direct and independent knowledge of *any* essential element of the underlying fraud transaction." *Id.* at 657.

It may be easier to begin with what Staley and the other relators *did not* know. None of them had ever worked at other Columbia facilities. None of them gives any hint that they worked with or had any communications with employees at other Columbia hospitals. None of them appears to have had any real contact with officials in "corporate" who would have had responsibility for hospitals beyond Indian Path. None of the relators asserted any *direct* knowledge of *anything* at *any* hospital in the Columbia network other than Indian Path.[15] *See, e.g.,* Hockett Depo. at pp. 78-79 [941-6]; Staley Depo. at pp. 16-26 [941-5]; Thompson Depo. at

---

[15]There is affirmative evidence that the relators based their amendments on media reports, not on any direct or independent knowledge. *See* Hockett Dep. 75-80; Staley Dep. 20-26. "[A] person who learns of fraud from a public disclosure can *never* be an 'original source.'" *Findley*, 105 F.3d at 690.

138 [941-4].  This is much the same as *Rockwell*, where the relator Stone no longer worked at

Rockwell when the conduct giving rise to liability occurred, and demonstrated no other way in

which he would have gained direct knowledge of what went on there.[16]

     We move now to what they *did* know, or at least, what they thought they knew.  Staley

has alleged that she had "several conversations" with Indian Path CFO Jim Matney.  Decl. of

Chyrissa Staley (Feb. 17, 2004) [952-4].  According to Staley, Matney said that he had been at

"HCA meetings in Nashville where they teach you how to get the most money, and that he was

the best at it.  In conversations with Mr. Matney, he would often say that he had to 'run it up the

ladder' or words to that effect,' which we all understood to mean that he had to consult with, and

get approval from, his superiors at the Nashville headquarters of HCA."  *Id.* at ¶ 6.  This is

essentially a repeat of what Staley said in her 2004 deposition – that is, a repeat of how her

testimony read after she and her counsel had a chance to review it and submit an errata sheet.

     In opposition to the motions to dismiss, Staley submitted a second declaration, in which

she asserted that, when the original three relators filed their lawsuit, she "wanted the lawsuit to

include allegations that HCA was doing the same wrongdoing for the new geropsych units at its

---

[16]It is worth distinguishing a recent opinion by this Court which held that the public disclosure bar did not apply.  In *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 2007 U.S. Dist. LEXIS 17664 at *9, Civil Action No. 95-1231 (D.D.C. Mar. 14, 2007) (Lamberth, J.), the relator filed a *qui tam* complaint alleging a unified fraudulent scheme to rig the bidding on a series of contracts, alleged that certain contracts definitely had been rigged, and alleged on information and belief that others within the series had also been rigged.  After the government intervened and turned up evidence as to which other contracts had been rigged, the relator amended his complaint to add these specific allegations.  The amendment did not assert "new allegations regarding a fundamentally different fraudulent scheme," *Rockwell* at 206, but merely filled in details of a general scheme the relator had already described.  In this case, relator's amendment merely reiterates a general allegation that was already publicly disclosed, and so *Miller* is inapposite.

other hospitals – inflating the TEFRA costs in the first year," but that they did not do this. Second Decl. of Chyrissa Staley (Aug. 21, 2006) [1205-2] at ¶1.  She went on to allege that, "[a]bout a month after the complaint was filed, I was interviewed by representatives of the US Government," and in these "extensive" interviews "included my discussions of my interaction and communications with Indian Path CEO Jim Matney, including his comments indicating that his actions in inflating the TEFRA costs improperly were being done under the direction of, and with the approval of HCA corporate, that he, along with his peers at the other hospitals, had received training in that regard at HCA corporate meetings."  *Id.* at ¶ 2.  Linda Thompson, a former relator, also submitted a declaration seeking to corroborate Staley's assertion of how the complaint was amended.  Decl. of Linda Thompson [1205-3] (Aug. 21, 2006).

Somehow none of the material cited in either of Staley's declarations was contained in the supplemental disclosure statement of Debra Hockett, which was what the relators actually filed with the government when they amended their Complaint. Supplemental Statement of Debra J. Hockett, M.D. (June 22, 1998) [1184-4].  According to Hockett's statement, she had "recently" had conversations with two Indian Path nurses, who told her that a Dr. Roberson at Indian Path had in turn told them about comments that Matney made to him about Columbia-sponsored meetings where inflation of TEFRA rates was discussed.  The language in Hockett's supplemental statement is almost identical to the allegations in paragraphs 36 and 37 of the Amended Complaint.  According to the 2006 declarations by Staley and Thompson, Hockett put this information in her disclosure statement because it "corroborated the information that relators had obtained from conversations with Jim Matney that the geropsych TEFRA unit was systemwide and was directed by HCA corporate."  Thompson Decl. ¶ 3.

The first that we heard of Matney making statements that suggested fraud elsewhere in the HCA system, it was in Hockett's supplemental disclosure statement, which accompanied the Amended Complaint.  Her allegation was that at a Columbia-run meeting, Matney heard TEFRA rates being discussed.  He then told Dr. Roberson something about this; Roberson then told two nurses, who then told Hockett, some time "recently" before the Amended Complaint was filed.  That statement relies on several layers of hearsay, post-dates the public disclosure, and fails to qualify *any* relator as an original source.  Direct knowledge is generally "first-hand knowledge." *Findley*, 105 F.3d at 690; *see also Schwedt* at 35 (knowledge was not direct where gained from subordinates or outside contractors); *Stinson* at 1160-61 (information gained through intermediaries is not direct).  Moreover, Hockett's statement – as with all of the relators' assertions about things Matney allegedly said – is highly conclusory in nature, asserting legal conclusions rather than what was actually said.

For about six years, this was the only indication anyone had that any of the relators had ever gained any knowledge on their own in support of paragraphs 36 and 37 in their Amended Complaint.  As the depositions of the three relators were taken – and Staley had a chance to amend hers in order to improve it on this point – it came out that all three claimed to have heard Matney make the same vague and generalized statements that Hockett said in 1998 that she had "recently" heard attributed to him through layers of hearsay.  Finally, in opposition to the instant motions to dismiss for want of subject matter jurisdiction, Staley submitted her 2006 declaration, which is again full of conclusory statements, and contains the uncorroborated assertion that she had heard Matney make incriminating statements and had provided this information to the

government prior to amending the complaint.[17]

The parties have argued over whether the Court can perform weighing of the evidence and make credibility determinations at this stage of the inquiry and without a hearing. The Court finds that it is unnecessary to hold a hearing or to await trial of this matter to rule on the jurisdictional issue. The evidence relator has submitted at each stage of the jurisdictional inquiry, which evidence has grown incrementally more self-serving with each iteration, is inherently not credible, but even if it were believed, it is insufficient to qualify relator as an original source. There is no evidence that relator had any direct or independent knowledge of *anything* that happened at any other Columbia/HCA hospital – let alone that fraud was committed at them – and her only purported knowledge bottoms on hearsay statements which require inference after inference to support a claim of fraud. This is insufficient to qualify this relator as an original source.

Under *Rockwell*, a relator must qualify as an original source for each distinct kind of claim or scheme she alleges. It is not enough that a relator was an original source of allegations that are linked by theme and subject matter to other allegations that are based on public

---

[17]Even if Staley herself heard Matney make statements that she thought implicated Columbia/HCA, Staley rarely attempts to describe what Matney actually said, rather than giving her own conclusory gloss on what she thought he meant. One of the only attempts she makes to outline what Matney is alleged to have said is her statement that Matney told her about "HCA meetings in Nashville where they teach you how to get the most money, and that he was the best at it. In conversations with Mr. Matney, he would often say that he had to 'run it up the ladder' or words to that effect,' which we all understood to mean that he had to consult with, and get approval from, his superiors at the Nashville headquarters of HCA." Decl. of Chyrissa Staley (Feb. 17, 2004) [952-4] at ¶ 6. Even if a secondhand statement could be a source of direct and independent knowledge, it is hard to say what knowledge was conveyed by statements like these. The distance between what Matney said and the conclusion that there was fraud at other HCA geropsych units is traversed only by making inferences, and inferences of the kind on which Staley relies are no better than the kind of predictions at issue in *Rockwell*.

disclosures.  The FCA "does not permit jurisdiction in gross just because a relator is an original source with respect to some claim."  *Rockwell* at 208.  This Court will not allow "claim smuggling" to "'rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action.'"  *Id.* (quoting *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000).  Relator is an original source of the "Phase I" allegations, but this cannot save her "Phase II" allegations.

> b. *"voluntarily provided the information to the Government before filing an action under this section which is based on the information"*

Relator is doubly doomed because, even if she had been shown to have direct and independent knowledge of the information underlying her amended complaint, a relator "must voluntarily disclose [her] information to the federal Government before filing [her] lawsuit. Such voluntary disclosure must occur prior to the public disclosures which invoke the jurisdictional bar."  *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999); *see also Tillson*, 2004 U.S. Dist. LEXIS 22246 at *36 (W.D Ky. 2004) (citing *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 645 (6th Cir. 2003)).  Relator has failed to meet this requirement as well.

In her second declaration, Staley claimed, for the first time and in a highly conclusory fashion, that she disclosed information supporting the allegations in the Amended Complaint during interviews with the government in the fall of 1997.  This statement, coming for the first time at this stage of the litigation, with no corroboration from anyone in the government, and after the relators had filed disclosure statements with no mention of any such interviews, simply cannot be credited.  Staley alleges no other point at which she, or any other relator, made an

adequate disclosure to the government.  As such, Staley fails on this prong as well.

This lawsuit is based upon allegations and transactions that were publicly disclosed in December 1997 by the *New York Times* article.  Relator did not have direct and independent knowledge of the information underlying the claims asserted in the amendment to her complaint, and has not established by credible, competent evidence that whatever "knowledge" she did have was voluntarily disclosed to the government prior to her filing of the amended complaint.  She fails on each of the prongs required to qualify as an original source, and therefore this Court is without subject matter jurisdiction over her claims for any conduct at any hospital other than Indian Path, and those claims are therefore dismissed.

## VI. SUMMARY JUDGMENT

## A. PRELIMINARY MATTERS

### 1. Motion to Strike

After defendants moved for summary judgment, relator moved to strike the motions [1239] as untimely.  She later sought to withdraw her motion, [1253], and then renewed it [1254] after attempting to comply with Local Civil Rule 7(m)'s meet-and-confer requirement.  Relator contends that the summary judgment motions were untimely.  As she states, the Court's September 7, 2001 Order [11 in Docket 99-3311] ordered that summary judgment motions would be due 60 days after the close of expert discovery.  The Court's August 23, 2005 Scheduling Order [1100] set forth that expert discovery would close after discovery of defendant's experts was complete.  In the August 15, 2006 Status Report [1202], relator announced that her expert discovery was complete.  According to relator, this started the clock running on the summary

judgment motions, which were not filed within 60 days of August 15, 2006.[18]

Relator's motion is DENIED.  While relator may have been done taking her discovery, the defendants were still attempting to secure follow-up discovery concerning her experts.  It was not until November 22, 2006 that relator served her last expert report on defendants, and it was that event which marked the close of discovery and started the countdown for summary judgment motions.  If relator had thought the discovery requests were unnecessary or made in bad faith as a means of delaying summary judgment briefing, she could have sought a protective order at the time, but did not.  A good-faith effort to obtain necessary follow-up discovery means that expert discovery was not closed, and it did not close until service of the last requested discovery, November 22, 2006.[19]  Defendants' summary judgment motions, filed within 60 days of that date, are timely, and relator's motion is without basis.

### 2.  Motion for Joinder

Horizon moved [1237] for leave to file joinder with HCA's summary judgment motion. Horizon's motion is GRANTED.  Relator opposed the motion, deeming it untimely but stating no other prejudice.  Horizon had filed its own substantive motion for summary judgment, and its

---

[18]The August 15, 2006 Status Report makes clear that (1) defendants were still conducting discovery and (2) it was merely the relator's position that discovery was ended. Relator cites no authority in support of her position that discovery ends when one party announces it has ended.

[19]The scheduling orders, operating together, were not ambiguous in their effect.  Even if they had been ambiguous, courts tend to construe ambiguities in scheduling orders in favor of permitting filings, especially where, as here, the parties often submit their own proposed scheduling orders to the Court, and therefore are in large part responsible for any ambiguities therein.  *See Bell v. Exec. Comm. of the United Food & Commercial Workers Pension Plan*, 191 F.Supp. 2d 10, 13 and n.7 (D.D.C. 2002) (Huvelle, J.); *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 2005 WL 1661696 at *2 (D.Conn. 2005).

motion for joinder followed closely on the heels of HCA's summary judgment motion.  The

delay caused no prejudice to relator, who has had ample notice and opportunity to develop the

record as to all defendants.  *See Crowley v. Chait*, 2004 U.S. Dist. LEXIS 27238 at *10-13

(D.N.J. 2004) (allowing untimely joinder in summary judgment for defendant that had not filed

its own summary judgment motion, where there was no prejudice to plaintiff, which had ample

opportunity to develop a record).

### B.  STANDARD

### 1. Summary Judgment

Where the pleadings, affidavits, depositions, answers to interrogatories, and admissions

of record demonstrate that there is no genuine issue of material fact and that the movant is

entitled to judgment as a matter of law, summary judgment shall issue.  *See United States of*

*America ex rel. K&R Limited Partnership v. Massachusetts Housing Finance Agency*, 456

F.Supp. 2d 46, 53 (D.D.C. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986).  At the outset, the burden is on the movant to demonstrate the lack of a material factual

dispute.  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A material factual

dispute is genuine, and thus bars summary judgment, where a reasonable jury conceivably could

find in favor of the non-moving party on that issue.  *Id.* (citing *Anderson* at 248).  Even where a

genuine, material fact dispute arises, summary judgment may still issue against "a party who fails

to make a showing sufficient to establish the existence of an essential element to that party's

case, and on which that party will bear the burden of proof at trial."  *Celotex* at 322.

At this stage, the Court must "draw all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence."  *K&R*, 456 F.Supp.

2d at 54 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Even

so, "'some statements are so conclusory as to come within an exception to' the general rule that

the non-movant's statements must be fully credited when adjudicating a motion for summary

judgment."  *Mahoney v. United States Marshals Service*, 454 F.Supp. 2d 21, 31 (D.D.C. 2006)

(quoting *Greene v. Dalton*,164 F.3d 671, 675 (D.C. Cir. 1999)).  "Thus 'wholly conclusory

statements for which no supporting evidence is offered' need not be taken as true for summary

judgment purposes."  *Id.* (quoting *Carter v. Greenspan*, 304 F.Supp. 2d 13, 21 (D.D.C. 2004)

(Huvelle, J.)).

A party cannot survive summary judgment unless it establishes more than a "mere

existence of a scintilla of evidence" in support of its claims.  *Anderson*, 477 U.S. at 252.  The

non-movant's opposition must go beyond "unsupported allegations or denials and must be

supported by affidavits or other competent evidence setting forth specific facts showing that there

is a genuine issue for trial."  *Carter*, 304 F.Supp. 2d at 21.  "If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at

249-50.  "In fact, summary judgment may issue where the movant points to a substantial lack of

evidence in the non-movant's case, or where the movant demonstrates that the non-movant has

failed to proffer evidence on which the jury could reasonably find for the non-moving party."

*K&R* at 54 (internal quotations and citations omitted).  "The summary judgment standard is 'very

closed to the reasonable jury directed verdict standard,' and despite their different procedural

postures, 'the inquiry under each is the same: whether the evidence presents a sufficient

disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must

prevail as a matter of law.'"  *Williams v. Chertoff*, 2007 U.S. Dist. LEXIS at *28, Civil Action

No. 05-211 (D.D.C. June 27, 2007) (quoting *Anderson*, 477 U.S. at 250-51).

## 2. False Claims Act Liability

As this Court has previously stated, the "False Claims Act ('FCA') aims to protect the federal fisc from false or fraudulent claims." *K&R*, 456 F.Supp. 2d at 54; *see* 31 U.S.C. §§ 3729-3733. The FCA creates liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a).

The three elements of FCA liability are that "(1) defendant submitted a claim to the government; (2) which was false; and (3) which the defendant knew was false." *K&R* at 54 (citing *United States ex rel. Harris v. Bernad*, 275 F.Supp. 2d 1, 6 (D.D.C. 2003)). In this case there are two things which could constitute "claims" under the Act: (1) the submission of the cost report at the end of the TEFRA-target period; and (2) the submission of individual UB-92 forms seeking interim reimbursement for patient care. Each of these is a "claim," defined as a "request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). *See also In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 344 (D. Conn. 2004) (discussing how both UB-92 and cost report are claims); *Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378 F.Supp. 2d 75 (E.D.N.Y. 2005) (same).

As to falsity, the plaintiff or relator "bears the burden of establishing that the claim or statement submitted to the government was false." *K&R* at 55 (citing *United States ex rel. Ervin & Assocs. v. Hamilton Sec. Group*, 370 F.Supp. 2d 18, 44 (D.D.C. 2005)).  The different ways in which a claim can be deemed "false" for FCA purposes are described more fully *infra*.

The FCA also has a scienter requirement, stating that there can be no liability unless the defendant "knowingly presents" a "false or fraudulent claim," where a person acts "knowingly" if he:

    (1) has actual knowledge of the information;
    (2) acts in deliberate ignorance of the truth or falsity of the information; or
    (3) acts in reckless disregard of the truth or falsity of the information,
    and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).  "The first element of 'knowingly' goes after subjective knowledge, while the second seeks out the kind of willful blindness from which subjective intent can be inferred.  As for reckless disregard, it is 'an extension of gross negligence,' or 'gross negligence-plus,' and is not merely a proxy for subjective intent." *K&R* at 61 (quoting *United States v. Krizek*, 111 F.3d 934, 942-43 (D.C. Cir. 1997)).  "Mere negligence cannot support liability under the FCA." *Id.* (citing *United States ex rel. Mikes v. Straus*, 84 F.Supp. 2d 427, 439 (S.D.N.Y. 1999)).  Though scienter is often a fact-bound inquiry, "summary judgment is appropriate where plaintiff produces no evidence sufficient to support a finding of the requisite scienter." *K&R* at 61-62 (citing John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04(c)(1) (2d ed. 2000) ("To avoid summary judgment for the defendant, admissible, credible evidence of a knowing false statement is required.")).

The summary judgment motions before the Court have specific focal points.  They do not

address whether the cost report submitted by IPH to the Medicare program is a false claim giving rise to liability; it is agreed that there are triable factual disputes on that point. The summary judgment motions instead challenge: (1) whether Horizon can be held liable for any conduct at Indian Path; (2) whether Columbia/HCA can be held liable for any conduct at Indian Path; and (3) whether any defendant can be held liable for statutory penalties as to each of the 66 UB-92 forms that relator claims were submitted during the time that IPH was fraudulently inflating its TEFRA costs.[20]

### C.  Liability of Horizon for FCA Violations at Indian Path

Horizon's motion for summary judgment [1218] is DENIED insofar as it seeks summary judgment as to all claims related to Indian Path. There is a triable issue as to whether Horizon can be held liable for FCA violations at IPH.[21]  Relator has presented evidence that IPH engaged

---

[20]The motions also seek summary judgment as to all claims related to conduct at other Columbia/HCA facilities beyond Indian Path. The Court determined that it does not have jurisdiction over these claims – read in conjunction with the parties' stipulation, which excludes Horizon from their ambit – because of the public disclosure bar of § 3730(e)(4). If the Court did have jurisdiction over those claims, it is highly unlikely that relator could have pointed to any evidence that would overcome summary judgment. The only evidence relator has presented is an "expert's" analysis of reserve cost reports at other Columbia/HCA facilities. Despite relator's insistence, the use of reserve cost reporting – whereby a Medicare claimant basically keeps a set of books representing its position on its reimbursable costs, and a backup set of books representing the worst-case scenario, should Medicare reject some of those costs as non-reimbursable – is not *per se* fraud. At most, discrepancies between submitted cost reports and reserve cost reports can become so great as to support the inference of fraud, and careful combing of the reports, similar to what relator's "expert" did, can help pinpoint the likely means that fraud was carried out. But none of this substitutes for proof. For instance, relator has not bothered to identify any single person at another HCA facility who participated in fraud, how they did it, or when.

[21]The Court has previously rejected Horizon's argument that it cannot be liable because it did not itself present a claim to the government. *See* Mem. Op. [793] (Feb. 23, 2003). A defendant can be liable for its role in causing a false claim to be submitted, whether or not it physically presents the claim itself. *See United States v. Raymond & Whitcomb Co.*, 53 F.Supp.

Horizon to provide management services specifically aimed at IPH's participation in the TEFRA

program.  Horizon executives participated in developing goals for raising the TEFRA rate and

tactics for achieving those goals, and communicated directly with officials and doctors at IPH.[22]

*See, e.g.,* Botsko Letter to Peace [1220-2]; Surber Letters to Peace [1220-2].

Horizon placed its employee, Cynthia Culberson, at IPH as the director of the GP unit.

Once there, according to a significant amount of evidence, she collaborated with the top three

IPH managers to run up the unit's TEFRA cost base through a number of schemes.[23]  She

communicated with her Horizon superiors often and in detail.  Nurses and doctors from IPH have

stated in affidavits and depositions that they heard Culberson encourage personnel from other

units to purchase equipment through the GP unit, that they saw her take orders, or that they saw

equipment that had been billed to the GP unit used elsewhere.  Others state that she told nurses to

falsify the records for attendance at group therapy sessions, and that she encouraged IPH

personnel to order unnecessary tests for patients based on their cost.  *See, e.g.,* Campbell Aff.

[1220-17]; Marcum Aff. [1220-6]; Hockett Dep. 11-12, 17-19, 24-27; Loy Affid. [1220-7];

Staley Dep. 79, 91-92; Peace Dep. 70 [1220-5]; Kelley/Fisher Memos (Ex. to Fisher Dep.);

---

2d 436, 445 (S.D.N.Y. 1999); *United States v. Incorp. Village of Island Park*, 888 F.Supp. 419,
439 (S.D.N.Y. 1995).  In the context of this case, submission of a false claim to a Medicare fiscal
intermediary gives rise to FCA liability.  *See United States ex rel. Clausen v. Laboratory Corp.
of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002).

[22]It should be noted that Surber's memo is not as damning as relator claims.  While
Surber did highlight the goal of raising the TEFRA rate, he defined the goal as a "reasonable"
rate, which may well be distinct from the unreasonable, inflated rate that Culberson allegedly
helped bring about.  Nonetheless, the Surber memo is part of a larger mix of evidence creating a
fact issue on Horizon's involvement in the IPH TEFRA manipulation.

[23]There is much less evidence that Bauer participated in the alleged scheme, when
compared to the evidence that Matney and Peace were involved.

Fisher Dep. 11-13 [1220-12].

As to scienter, there is substantial evidence that Culberson acted with the intent of achieving a TEFRA rate that did not reflect the true operating cost of the GP unit and knowingly participated in the purchase of equipment that was wrongly billed to the GP unit, among other things.  For instance, according to one nurse at IPH, when an auditor was scheduled to visit IPH, Culberson was responsible for rounding up gurneys that had been billed to the GP unit under the TEFRA program but were intended for use elsewhere in the hospital, returning them to the GP unit in an effort to deceive the auditor.  *See, e.g.,* Loy Aff.  Others attempted to question Culberson about the propriety of these practices, and were told to keep quiet and mind their business.  *See, e.g.,* Loy Aff.; Marcum Aff.; Campbell Aff.  Such conduct is evidence of a knowing attempt to cover up fraud.  Relator has also come forward with evidence that Culberson participated in the concerted effort to slash costs after the TEFRA base period had ended, which was a key aspect in effectuating the fraudulent scheme.  For instance, during the TEFRA period, Culberson encouraged the ordering of expensive tests of dubious necessity, but after the TEFRA period ended, she went out of her way to avoid incurring test-related costs.  Hocket Dep. 24-25.

Knowledge can be attributed to Horizon through its agent, Culberson, and could also be inferred through her communications with her superiors, as well as their own communications with IPH managers.  The evidence of Horizon's direct and knowing participation in the alleged fraud at Indian Path is enough to survive summary judgment.

### D.  Liability of HCA for Conduct at Indian Path

Columbia/HCA seeks summary judgment in its favor as to all counts, claiming that it cannot be held liable for conduct committed at Indian Path, its indirect subsidiary at the time in

question.  Relator argues that Columbia/HCA should be held liable for its direct involvement in

the conduct at Indian Path, and also appears to suggest that veil piercing or some other form of

derivative liability might be appropriate.

It has been established that merely "[b]eing a parent corporation of a subsidiary that

commits a FCA violation, without some degree of participation by the parent in the claims

process, is not enough to support a claim against the parent for the subsidiary's FCA violation."

*United States ex rel. Tillson v. Lockheed Martin Corp.*, 2004 U.S. Dist. LEXIS 22246 at *107

(W.D. Ky. 2004); *see also United States v. Bornstein*, 423 U.S. 303 (1976) (prime contractor not

automatically liable for subcontractor's violation).  Relator must be able to demonstrate either

that HCA is liable under a veil piercing or alter ego theory, or that it is directly liable for its own

role in the submission of false claims.

### 1.  Veil Piercing

Because relator's claims are brought under the False Claims Act and relate to the federal

Medicare program, "federal law, therefore, controls the veil-piercing question."  *United States of*

*America ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp. 2d 35, 39 (D. Mass. 2000)

(citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979)).  "Except in unusual

circumstances, courts will not disregard the separate identities of a parent and its subsidiary, even

a wholly-owned subsidiary."  *Securities Industry Ass'n v. Federal Home Loan Bank Board*, 588

F.Supp. 749, 754 (D.D.C. 1984).  The question whether to disregard corporate form, expressed

most simply, proceeds in two steps: "(1) is there such unity of interest and ownership that the

separate personalities of the corporation and the individual no longer exist?; and (2) if the acts

are treated as those of the corporation alone, will an inequitable result follow?  Relevant to the

first question is the issue of the degree to which formalities have been followed to maintain a

separate corporate identity.  The second question looks to the basic issue of fairness under the

facts."  *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982).

A court can pierce the veil between the parent and subsidiary only where the parent "so

dominated the subsidiary corporation as to negate its separate personality."  *AGS Int'l Servs. S.A.*

*v. Newmont USA Ltd.*, 346 F.Supp. 2d 64, 89 (D.D.C. 2004) (Walton, J.) (internal punctuation

and quotation omitted).  *See also Kneepkins*, 115 F.Supp. 2d at 39-40 (in FCA case, "the veil

may be pierced only if the parent and subsidiary lacked independence, the principals conducted

their affairs with a requisite degree of 'fraudulent intent,' and failure to pierce the veil would

work substantial injustice.") (citing *United Elec., Radio and Machine Workers v. 163 Pleasant*

*St. Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992)).  In such a case, the subsidiary is deemed to be the

parent's alter ego, agent, or mere instrumentality.

On the first prong, courts look to whether "the parent exercised such control over the

subsidiary that the subsidiary has become its 'mere instrumentality.'"  *Penick v. Frank E. Basil,*

*Inc.*, 579 F.Supp. 160, 165 (D.D.C. 1984).  Among others, the factors to be considered in

applying this test include identity of ownership; commonality of officers and directors; the

financial relationship between parent and subsidiary; whether the two maintain separate books,

records, offices, and the like; and whether property of one is used by the other as essentially its

own.  *Bulletin Broadfaxing Network, Inc. v. The Times Mirror Co.*, 1992 U.S. Dist. LEXIS 6399

at * 14-15 (D.D.C. 1992) (Flannery, J.).  The veil-piercing inquiry rests in the discretion of the

trial court, *Valley Finance Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980), and a court

should respect the corporate distinction between parent and subsidiary unless those separate

personalities have, in practice, been negated. *See Quinn v. Butz*, 510 F.2d 743, 758 (D.C. Cir. 1975); *AGS*, 346 F.Supp. 2d at 89-92 (collecting cases); *Material Supply Int'l Inc. v. Sunmatch Indus. Co.*, 62 F.Supp. 2d 13, 19-20 (D.D.C. 1999) (Urbina, J.) (same).

The sparse amount of actual evidence that has been presented on this matter indicates that Columbia/HCA and IPH maintained their distinct corporate personalities and that the corporate form must be respected. Relator has failed to come forward with much at all in the way of affirmative evidence. She puts heavy emphasis on testimonial evidence that the top three IPH officers, Bauer, Matney, and Peace, were all treated as "corporate" employees, that is, were paid from a different payroll than the other IPH employees, one that originated at the Nashville corporate headquarters. *See, e.g.,* Bauer Dep. 7-8, 11. She also puts great weight on the fact that Jack Bovender, then a top corporate official at HCA, acted directly to fire Bauer and Matney.

Relator also has done sparse little to address defendants' evidence that several layers of corporate entities separated Columbia/HCA from the Indian Path corporate entity.[24] For HCA to be liable, it would have to be the case that the veil between each layer could be pierced, or that HCA be found to have reached past these corporate forms to directly use IPH as its mere agent or instrumentality. It does appear that the directors of at least some of these entities were the same, but an identity of officers or directors does not require a finding that separate corporate forms have been abandoned. *See AGS* at 90 (citing *Diamond Chemical Co. v. Atofina Chems. Inc.*, 268

---

[24]The ownership chain, according to testimony by an HCA vice president, was that the Indian Path Hospital was owned by IPH, Inc., which was owned by HCA, Inc., which was owned by HCA-Hospital Corporaton of America, which was owned by Western Plains Regional Hospital, Inc., which was owned by Columbia/HCA Healthcare Corporation. Bray Depo. 21-24. According to defendants, Columbia/HCA is a holding company without employees; its work is done by the employees of Galen, a management services company that is owned by Columbia/HCA.

F.Supp. 2d 1, 9 (D.D.C. 2003) (Kollar-Kotelly) (same)).

On the other hand, there is testimonial evidence that all of these boards did meet regularly, and that other corporate formalities were maintained.  *See* Bray Dep.  Even the evidence of IPH executives being paid through HCA's corporate office winds up supporting HCA in the end, since the company billed IPH for these salaries, further evidence that formalities were routinely observed and the parent did not treat the subsidiary as a mere extension of itself. *See* Bray Dep.  9-11.  While relator has presented some evidence that the three top IPH officers – Bauer, Matney, and Peace – referred to themselves as Columbia employees, their perception is not dispositive, and it is not entirely clear that they were referring to themselves as being direct employees of the HCA entity in a legal sense.  Viewing the evidence in the light most favorable to relator, and drawing all inferences in her favor, the Court still finds that relator has come up woefully short of the showing necessary to justify piercing the corporate veil.[25]

---

[25]Here and elsewhere, relator repeatedly attempts to bind Columbia to assertions it made during the course of a lawsuit Robert Bauer brought against Columbia in Tennessee state court, revolving around the same basic controversy at issue here.  Relator contends that Columbia should be bound by those statements under the same logic that led this Court to conclude that relator Thompson was barred from pursuing this cause of action because of her failure to list it in her bankruptcy estate.  But as the Court pointed out in that opinion, "the D.C. Circuit has held, as a general matter, that the doctrine of judicial estoppel, which teaches that 'a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position," is not favored in this jurisdiction absent extreme circumstances evincing a party's calculated intent to manipulate the second court."  Mem. Op. & Order [989] (July 7, 2004) at 8 (internal citation omitted).  Judicial estoppel was appropriate against Thompson only because of the unique circumstances of her case, which involved the bankruptcy court and this Court, and which strongly suggested that Thompson was proceeding "in a calculated manner to manipulate a second court."  *Id.* (quoting *American Methyl Corp. v. EPA*, 749 F.2d 826, 833 n.44 (D.C. Cir. 1984)); *see also United Mine Workers v. Pittson Co.*, 984 F.2d 469, 477 (D.C. Cir. 1993); *Coastal Plains, Inc. v. Mims*, 179 F.3d 197 (5th Cir. 1999); *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002).

Relator also argues that Jim Matney's invocation of the Fifth Amendment privilege at a deposition should give rise to adverse inferences against Columbia/HCA.  While there is little on

### 2.  Direct Involvement

Columbia/HCA can, however, be held liable if it was directly involved in submitting false claims or causing them to be submitted to the government.  Relator has come forward with evidence that Columbia/HCA was directly involved in the process of finalizing the cost report and billing the government.  *See* Bauer Dep. 38-39; Belcher Dep. 171-174.  Notably, there is evidence that a Columbia/HCA corporate official instructed an employee who was preparing the amended cost report to obscure the true nature of the cost overstatements in the original cost report.  *See* Belcher Dep. 81-82; Jan. 20, 1998 Email from L. Wright to J. Matney (with forwarded email) [1238-24].  Correspondence with the Medicare fiscal intermediary regarding IPH's cost report was conducted on Columbia/HCA letterhead, *see, e.g.,* Ex. U to Opp. to Defendants' Mot. for SJ [1238], and this correspondence was a central part in consummating the fraud, and then attempting to cover it up – or so a reasonable jury could find.

There of course is some evidence that Matney said he had been schooled in TEFRA-

---

this point in our Circuit, other courts have been willing to permit adverse inferences against a party from the invocation of the Fifth Amendment right by a non-party witness in limited circumstances.  *See John Paul Mitchell Systems v. Quality King Distributors, Inc.*, 106 F.Supp. 2d 462 (S.D.N.Y. 2000); *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997).  These courts consider "a variety of factors, including (1) the nature of the relationship between the party and the non-party; (2) the degree to which the party controls the non-party; (3) the compatibility of the interests of the party and non-party in the outcome of the litigation, and (4) the role of the non-party witness in the litigation."  *Quality King* at 471 (citing *LiButti* at 123).  "The overarching concern is fundamentally whether the adverse inference is trustworthy under all the circumstances and will advance the search for truth."  *LiButti* at 124.

Having considered these factors and the circumstances of this case, no adverse inference will be drawn against Columbia/HCA from Matney having sheltered under the Fifth Amendment.  Matney's relationship to HCA, particularly at the time he pled the Fifth when he was not a Columbia employee and Columbia exercised no control over him, does not render the inference trustworthy when used against HCA.  In addition, the litigation interests of Matney and the Columbia defendants are frequently divergent and sometimes directly at odds.

inflation techniques – with the intimation that these techniques were improper – at meetings for hospital executives that were organized and conducted by HCA.[26]  *See, e.g.,* Staley Decl. ¶ 6 (Feb. 17, 2004); Staley Dep. 128, 131.   Similarly, Matney stated that he sought approval from Columbia/HCA superiors of his actions at IPH.  *See, e.g.,* Staley Dep. 128-29; Thompson Dep. 138.  This evidence may not be strong, but is part of the larger mosaic that creates genuine issues of material fact on this point.

Relator has also provided some evidence that corporate officials, such as Bill Gracey and Scott Rapley, regularly communicated with Bauer, Matney, and Peace regarding the GP unit's TEFRA initiative and the need to increase the TEFRA rate.  *See, e.g.,* Bauer Dep. 135; Peace Dep. 274.  The frequency and level of detail of this communication support an inference that the corporate employees were aware of what was happening at IPH.

In addition, if Columbia/HCA reviewed IPH's cost reports, a reasonable jury could infer the requisite scienter.  For instance, the marked drop-off in costs immediately after the TEFRA period ended, as well as the magnitude of the amendments to the cost report that were made, all support the inference that Columbia/HCA at least acted with "reckless disregard."  31 U.S.C. § 3729(b)(3).  The requisite scienter has been found where a defendant "failed utterly" to review bills that were submitted on its behalf and were so patently false that "even the shoddiest recordkeeping would have revealed that false submissions were being made."  *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *see also United States ex rel. Ervin & Assocs., Inc. v.*

---

[26]These allegations were added in paragraphs 36 and 37 of the Amended Complaint, and as the Court has held, the new causes of action asserted therein are outside the Court's jurisdiction because relator was not an original source for the publicly disclosed allegations on which those claims are based.  But this does not mean that the two paragraphs drop out of the case as evidence, to the extent they are relevant to the liability of defendants for conduct at IPH.

*The Hamilton Secs. Group, Inc.*, 370 F.Supp. 2d 18, 41-43 (D.D.C. 2005) (finding requisite scienter where defendants ignored and made no attempt to investigate obvious warning signs that their claims were false).

This is not to say that relator's evidence is overwhelming, but merely that, viewed in the light most favorable to her, it creates a triable issue. Columbia has asserted what may be a viable defense; that Columbia/HCA itself has no employees and that some other corporate entity in the Columbia/HCA family is the proper defendant. But the dispute on this point is genuine, and Columbia/HCA's testimonial evidence has been controverted, such that summary judgment is not appropriate. Based on the record as it stands, there is a genuine factual dispute as to whether the Columbia/HCA corporate entity itself participated in submitting a false claim or causing one to be submitted, in concert with IPH, even though the corporate distinctions between the two were still observed. The motion for summary judgment by HCA on this point must be denied.

### E.  UB-92s as False Claims

Defendants seek summary judgment on relator's claims for statutory penalties for the 66 UB-92 forms identified by relator as having been submitted during the last three months of the TEFRA period (December of 1996 and January and February of 1997). At stake are the statutory penalties; the FCA permits recovery of a statutory penalty for each individual false claim that a defendant submits to the government. Thus relator can increase her potential recovery if she can establish that the UB-92 forms were false claims, and not just the cost report submitted at the end of the TEFRA period.

The UB-92 essentially is an invoice stating that patients A, B, and C were treated at the geropsych unit for X, Y, and Z number of days, respectively. These forms caused the

58

government to reimburse Indian Path at a previously negotiated per-patient, per-day rate.

Defendants argue that relator has not identified any false statement contained in those claims, but

relator says that the claims are rendered false by the fraudulent conduct of IPH officials.  In

addition, she argues that patients were held in the GP unit longer than required to treat them, so

the UB-92s were false when they certified that the services being invoiced were medically

necessary.

      The Court conceives of three ways in which a UB-92 in this case could have been a false

claim.  "It may be factually false if it 'incorrectly describes the goods or services provided or a

request for goods or services never provided,' or it may be legally false because of an express

false certification or an implied false certification."  *In re Cardiac Devices Qui Tam Litig.*, 221

F.R.D. 318, 345 (D.Conn. 2004) (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697-

98 (2d Cir. 2001).  Express false certification is "a claim that falsely certifies compliance with a

particular statute, regulation or contractual terms, where compliance is a prerequisite to

payment."  *Mikes* at 698.   On the other hand, "[u]nder an implied false certification theory, the

act of submitting a claim for reimbursement itself implies compliance with the governing federal

rules that are a precondition to payment."  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318,

345 (D.Conn. 2004).  "[I]mplied false certification is appropriately applied only when the

underlying statute or regulation upon which the plaintiff relies expressly states the provider must

comply in order to be paid."  *Mikes* at 700.

      It is important to keep these three theories distinct.  A UB-92 is factually false if it

invoices for services that were not rendered, i.e., if it states that patient X stayed for five days

when he really stayed for three.  A UB-92 contains an express false certification if, though the

services invoiced were actually rendered, the form expressly certifies something that is false: in

this case, that the services which were actually rendered were medically necessary.  A UB-92

contains an implied false certification if the act of billing the government implies that defendants

complied with some law or regulation that was an express condition precedent to payment: in

this case, the theory is that defendants implied that they were complying with the laws and

regulations governing Medicare, when in reality they were committing a fraud that would result

in the submission of a false cost report.

### 1.  Factually False

Relator does not appear to contend that any of the UB-92s were factually false, that is,

that they misstated the services actually rendered.[27]  There is no evidence that UB-92s were

factually false, and no allegation or evidence that IPH was over-reporting the number of patients

it treated or the length of their stays.  The number of patients stayed for the number of days that

IPH said; the next question is whether they should have.

### 2.  Express Certification

The UB-92s expressly certify that the services for which they are billing were actually

provided and were medically necessary.  *See Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378

F.Supp. 2d 75 (E.D.N.Y. 2004).  This certification is false if patients were required to stay longer

---

[27]Relator alleges that some records were falsified, listing patients as having attended
group therapy sessions when they did not.  That fraud, if proven, goes to the cost report, not the
UB-92s.  Relator also alleges that Culberson altered certain patient records to delete any
predictions of when a patient might be released.  Relator points to no Medicare regulation
requiring that such records be kept and conditioning payment on them.  Instead, this allegation, if
proven, would simply be evidence in support of the allegation that Culberson sought to keep
patients in the GP unit longer than was necessary to treat them.

than necessary.[28]

Relator has produced a number of statements from doctors and nurses at IPH to the effect that there were instances when patients stayed in the GP unit longer than was necessary to treat their condition, or past the point when some other, better treatment alternative was available.[29] Culberson is the only culprit identified. But relator's evidence on the length of patient stays rarely gets into specifics. For instance, Linda Thompson identified one patient who she thought may have stayed longer than medically necessary. *See* Thompson Depo. pp. 73-85 [1236-2]. But, as HCA has pointed out, that patient was not treated during the three-month period at issue here, and thus any claims submitted in connection to him cannot give rise to liability. *See* Decl. of Michael S. Kelley ¶¶ 2-7 [1236]. Dr. Hockett identified one other patient who she felt was kept longer than necessary in order to boost the TEFRA rate. *See* Hockett Depo. at 14-15 [1236-5]. But there is nothing else in the record to identify who that patient was or when he or she was treated, or whether the patient truly was held longer than necessary.

Relator has had access to the records of the 66 patients at issue. No attempt has been

---

[28]The parties have done surprisingly little to develop the record as to what the UB-92 actually says and does. Based on its reading of the cases and regulations, the Court concludes that the UB-92's certifications expressly warrant that the services rendered were medically indicated. At least one court has treated this certification as implied, implying compliance with the Medicare requirement of medical necessity, which is an express condition of payment. *See Cardiac Device*, 221 F.R.D. at 335. Even if the certification was treated as implied, this Court's analysis, and the ultimate outcome, would remain the same. The relator's theory of implied certification in this case, discussed *infra*, is of a much different nature.

[29]"The requirement that a service be reasonable and necessary generally pertains to the selection of the particular procedure and not to the manner of its performance." *Cardiac Device*, 221 F.R.D. at 335. The Court is acutely aware that at some point, the question of whether a patient should be discharged becomes one of medical opinion, and that where reasonable medical minds might differ over the preferred course of treatment, FCA liability will be inappropriate. We are not forced to confront those issues in this case.

made to review each of those records to determine if impropriety can be gleaned from them.

Likewise, there has been no concerted effort, through discovery aimed at records keepers or

caregivers, to pin down the who, what, and when of the alleged false claims.  All that relator has

produced is the general allegation, supported by very limited evidence of limited competence,

that patient length-of-stay was being manipulated.  The "expert" reports of Dr. Ciesla and Dr.

Belin are of no help whatsoever.  It may be true that the length-of-stay spiked during the three

months marking the end of the TEFRA target period, and that this spike is statistically significant

and suggestive of *some* causal factor beyond mere chance.  But the doctors' analyses of aggregate

data do nothing to identify that cause, let alone establish liability.

Indeed, relator has herself alleged facts that would explain the lenght-of-stay spike

without a single patient having been overheld.  For example, relator alleges that Culberson and

others recruited to the GP unit sicker patients who would need to stay longer than average, that

they may have manipulated admission decisions along the same lines, and that they routed sicker

patients from the Pavilion to the GP unit.  If these allegations are proven – and relator only puts

forward a scant amount of testimonial evidence – then Culberson and others may have

committed fraud, but the fraud is confined to the representation in the cost report.  If the patients

were sick and stayed only as long as medically necessary, there is no expressly false certification

in the individual UB-92s.  Given this alternative explanation for the aberrant increase in the

length of patient stays, it is all the more imperative for relator to produce real evidence to support

her contention that patients were actually held longer than necessary.  This is especially true since

none of relator's evidence goes to eliminate any of the many other, completely innocuous

alternative explanations for the increased length of patient stays – such as the patients just getting

sicker.

Relator points to evidence, and admittedly there is some, that Culberson and others in the GP unit intentionally sought to increase the length of patient stays, and sometimes did this by holding patients longer than was necessary, with the only reason for their continued stay in the unit being Culberson's desire to increase the TEFRA rate.  Because this evidence supports the inference that patients indeed were held too long, relator says that it is "it is reasonable for the court to employ assumptions in calculating the number of false claims that do not require the specific identity of each false claim included in the calculated number.  Here, given the size of the increase in the average [length-of-stay per patient in the GP unit], and the small amount of change necessary to increase the amount of the claim fraudulently . . . it is reasonable to use all of the sixty-six UB-92s issued during the period as the number of calculations."  Opp. to HCA Defendants' Mot. for SJ [1238] at 14.  In concise form, since there is evidence of a general nature that Culberson tried to hold patients longer than necessary, and since relator's experts opine that the average length-of-stay spiked during the TEFRA period in a way that is statistically significant and not random, then the Court should assume that all patients in the subject range were held too long, and should determine the number of days they were over-held by subtracting the new, increased average length-of-stay from the old, lower average length-of-stay.  Welding different inferences together cannot substitute for direct proof, of which relator presents none.

Relator puts great emphasis on *United States v. Krizek*, a line of cases that shuttled between this District and the D.C. Circuit Court of Appeals.  *See* 192 F.3d 1024 (D.C. Cir. 1999); 111 F.3d 934 (D.C. Cir. 1997).  The long and short of *Krizek* was that the government accused a psychiatrist of billing Medicare for services that were not rendered.  Under the facts of

that case, it was next to impossible to determine which of the thousands of bills at issue were the

false ones, but there assuredly was *some* liability, since the Krizeks had repeatedly billed for

more than 24 hours of patient care in a day.  The parties ultimately agreed to a limited use of

sampling as a means of determining how many false claims there were, rather than proceeding to

trial on 8,002 claims.  111 F.3d 934, 940-41.  The fact that there was *some* liability was a

foregone conclusion, and the nature of the case meant that "[a] determination of liability on the

issue of improper coding would be equally applicable to all other claims."  *United States v.*

*Krizek*, 1994 U.S. Dist. LEXIS 21095, No. 93-54 at 2 (D.D.C. 1994) (Sporkin, J.).  The nature of

the claims also meant that there was not much importance in identifying which specific claims

were false; the most important part was identifying how many false claims there were, since the

damage caused by each of the uniform claims would be similar.[30]  In addition, the Court of

Appeals tacitly condoned the possibility of the trial court using a "reasonable day" standard of

nine hours in determining how many false claims were submitted, rather than a 24-hour day,

since it was next to impossible that Dr. Krizek had clocked multiple days in which every hour

was filled with patient visits.

    *Krizek* thus permits that where some degree of liability is conceded, slight deviations

from traditional modes of proof are tolerable along the following lines: (1) sampling will be

allowed upon the consent of the parties; (2) a court may use a reasonable estimate of the number

of working hours in a day, and need not rely on 24 hours as the definition of a working day; and

(3) where 24 hours is used as the benchmark, "[t]he Government need not prove which particular

---

[30]In a case such as this, it is essential that the specific UB-92s that are false be identified,
since each bills for a different length-of-stay, which will in turn affect the calculation of damages.

patient sessions occurred after the twenty-fourth hour." *Krizek*, 192 F.3d 1024, 1030 (D.C. Cir. 1999).

None of these devices come into play here.  First and foremost, liability is not conceded here as to any of the UB-92s, and as the Court has explained, it is entirely possible that none of the UB-92s was a "false claim" under the Act.[31]  Second, defendants have not consented to sampling or any other deviations from traditional proof.  Third, the kind of estimate based on reasonableness that the *Krizek* court would have allowed – an estimate that Dr. Krizek worked nine billable hours in a day instead of 24 – is entirely different from what relator seeks in this case.  Relator appears to be asking that the Court adopt the pre-existing average length of stay as the ironclad maximum, and find liability for any UB-92 that billed for a stay exceeding that maximum.  This is entirely inappropriate and not at all what was sanctioned in *Krizek*.  *See United States ex rel. Aflatooni v. Kitsap Physicians Service*, 314 F.3d 995, 1002-1003 (9th Cir. 2002) (declining to apply the kind of inferences used in *Krizek* in a *qui tam* case where relator only made "generalized, speculative suppositions" of a "private scheme," but "cannot bring forth even a single false claim").  *See also United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 856-57 (7th Cir. 2006); *United States ex rel. Quinn v. Omnicare, Inc.*, 382

---

[31]*Krizek* was also a case where it would be extremely difficult and time consuming to attempt to prove each violation of the FCA, yet the government was willing to go forward and attempt to do so if necessary.  Here there are only 66 claims at issue, not thousands, and there are medical records and numerous witnesses from whom relator could seek evidence, whereas in *Krizek*, much of the evidence could only be known to the defendants.  There is no indication that relator faces the kind of daunting challenges in proving her claims that beset the government in *Krizek*.  She has made no effort to review the available evidence, and thus is in no position to make a showing that difficulties of proof warrant deviations from the traditional conduct of trials. The allegation that Culberson modified patient records to cover her tracks does not absolve relator for failing to even try to identify a patient who held too long.  There are other available forms of evidence.

F.3d 432, 440 (3d Cir. 2004); *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*,
290 F.3d 1301 (11th Cir. 2002).

Other cases relied on by relator are inapposite, standing merely for the proposition that,
where liability, and thus the fact of *some* damage, is established, the inability to ascertain the
*amount* of damages with mathematical certainty should not stand as a bar to recovery,
particularly where the difficulty in fixing the amount of damages results from the defendant's
own wrongdoing.  *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S.
555 (1931); *United States v. American Packing Corp.*, 125 F.Supp. 788 (D. N.J. 1954).  But in
the case at bar, it is liability itself that is uncertain, not just the extent of damages.

### 3.  Implied Certification

Relator also argues that, whether or not the UB-92s contained false statements, they were
all rendered false by the underlying fraudulent scheme. *See* Opp. to HCA Defendants' Mot. for
SJ [1238] at 27 ("each time the administrators submitted a UB-92 to the fiscal intermediary that
sought payment for a patient stay that took place in the GP Unit during that three-month period
they submitted a false claim because the UB-92 failed to disclose that, by their systematic
fraudulent efforts, they were acting in a manner contrary to the core terms of TEFFRA [sic]
Medicare program.").

Because relator has not presented evidence identifying a single patient who was held at
the hospital longer than necessary in order to increase the TEFRA rate, her implied certification
theory of liability for the UB-92s must rest on the other allegedly fraudulent conduct at the GP
unit.  Unlike the form of express false certification discussed above, this theory of implied false
certification is an all-or-nothing affair: if the Court accepts the theory, all UB-92s submitted

during the course of the fraudulent conduct are permeated with that fraud and are false claims.

Under this theory, it is not the express statement in the UB-92 that is false and gives rise to

liability – that patient A stayed at the GP unit for X number of days – but rather an implied

statement that there was no fraud going on at Indian Path.  This means that fraudulent conduct

that went to the year-end cost report, and which did not go to the express representations in the

UB-92s, would render all claims false that were submitted while the fraud was ongoing.

      The theory of implied false certification does not apply here.  It typically applies where:

(1) the defendant submits a claim, thus impliedly certifying compliance with a condition; (2) that

condition, by virtue of some background regulation, law, or other requirement, is an explicit

condition precedent to payment; and (3) compliance with that condition precedent is essential to

the government's decision to pay.  As this Court has previously stated in an exhaustive analysis

of implied certification cases, the regulation at issue must expressly condition payment on

compliance.  *United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238

F.Supp. 2d 258, 263-66 (D.D.C. 2002) (analyzing *United States ex rel. Pogue v. American

HealthCorp, Inc.*, 914 F.Supp. 1507 (M.D. Tenn. 1996)); *see also United States ex rel. Siewick v.

Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000); *Harrison v.

Westinghouse Savannah River Co.*, 176 F.3d 776, 793 (4th Cir. 1999).

      Relator has not identified a regulation or law in this case that specifically conditions

payment on compliance with a law, regulation, or other requirement that IPH violated.  While it

is true that Medicare regulations require that a claimant provide a fiscal intermediary with

""information to determine whether payment is due and the amount of payment," 42 CFR §

424.5(a)(6), this kind of general reporting requirement does not create an affirmative duty to

disclose all violations of law at a claimant facility, or even all violations of Medicare-related law.

Likewise, 42 U.S.C. § 1320a-7b, as well as other Medicare-related statutes, 42 U.S.C. §§ 1320 *et seq.*, criminalize Medicare fraud, but do not create independent duties to disclose the existence of fraud when filing other claims under Medicare.[32]  "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA."  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 266 (9th Cir. 1996); *see also United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir. 1977) (FCA applies only to false statements and "was not designed to reach every kind of fraud practiced on the Government") (quoting *United States v. McNinch*, 356 U.S. 595, 599 (1958)).

An even more exhaustive survey of this issue was conducted by the court in *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp. 2d 1017 (S.D. Tex. 1998).

Dealing with alleged violations of the anti-kickback statute under a Medicare billing program highly similar to the one in this case, the court held that annual cost reports were false claims because of the defendants' violations of the anti-kickback laws.  First, the federal statutes explicitly conditioned payment on compliance.  Second, the cost reports required an explicit, albeit somewhat general, certification of compliance with applicable law, with specific reference to the anti-kickback law.  Third, there was evidence that the government would not have paid the claims because compliance was so central to the payment decision.  None of these elements is present here.  The only allegations of fraud left in this case – since relator brings forth no

---

[32]It is also worth noting that these statutes generally do not impose any sanction until after a finding, by a factfinder in a criminal or civil case or the Secretary of Health and Human Services in an administrative matter, that fraudulent conduct has already occurred.  Relator seeks to use the Medicare statutes to create an affirmative disclosure duty while fraud is occurring.

evidence that patients were kept longer than necessary – go to the year-end cost report, not the UB-92s.

For instance, many of these implied certification cases involve eligibility; the claimant implicitly certifies with each claim that it remains eligible for the specific federal program under which its claims are submitted.  *See, e.g., United States v. TDC Management Corp. Inc.*, 288 F.3d 421, 426 (D.C. Cir. 2002) (government contractor in program for minority-owned businesses found liable under FCA because it "defrauded the government by presenting reports in support of payment that omitted information indicating that it was acting in a manner that was contrary to the core terms of the program," which terms were explicit conditions of payment); *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994) (contractor's "payment vouchers represented an implied certification by [defendant] of its continuing adherence to the requirements for participation in the . . . program," where payment was explicitly conditioned on compliance); *United States ex rel. Grayson v. Advanced Management Technology, Inc.*, 221 F.3d 580 (4th Cir. 2000).

Eligibility is determined, however, by some specific set of regulations or rules, or by conditions agreed to by the parties.[33]  None of these cases has involved general compliance with other law where that law does not specifically condition payment on compliance.  *See, e.g.,*

---

[33]To that end, the theory comes into play with contracts that are fraudulently induced, such as in instances of bid rigging.  *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943); *Bettis v. Odebrecht Constrs. of Cal., Inc.*, 393 F.3d 1321 (D.C. Cir. 2005); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003).  While the bills or invoices submitted under a fraudulently induced contract may be true as far as they go, they are said to be permeated with the taint of the original, fraudulently induced contract, and are thus false claims themselves.  The question is one of eligibility in the first instance; had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made.

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir.

1997); *United States ex rel. Wilkins v. North American Construction Corp.*, 173 F.Supp. 2d 601,

632 (S.D. Tex. 2001) ("The courts have, however, distinguished between fraudulent statements

about pricing or costs made in the bidding and invoicing process, as to which False Claims Act

liability can attach, and omissions made without an obligation to disclose, on which liability

cannot rest.") (citing *United States ex rel. Berge v. Board of Trustees of Univ. of Alabama*, 104

F.3d 1453 (4th Cir. 1997)).  Where a violation of other law has been found to render claims false,

there typically is an "express certification of compliance with applicable law," not an implied

representation.  *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp. 2d 35,

43 (D.Mass. 2000) (citing *Gublo v. NovaCare, Inc.*, 62 F.Supp. 2d 347, 355 (D. Mass. 1999);

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp. 2d 1017, 1048

n.33 (S.D. Tex. 1998)).

       The *sine qua non* of all these cases is that payment is clearly conditioned on compliance

with certain requirements.  In a sense, the requirement is explicit while the certification of

compliance with the requirement remains implicit.  This case does not match up with the implied

false certification cases.  Relator does not identify what is being implicitly certified here.  Nor

does she identify any explicit term, condition, regulation, or the like upon which payment is

specifically conditioned in this case.  It cannot be the case, and no court has so found, that *any*

violation of law or regulations would render all claims false.  Nor is it necessarily clear that the

government would have refused payment, since the fraud at issue went to the cost report and the

next year's TEFRA rate, not the UB-92s that were already submitted, and which billed for

services actually rendered.  True, the government may have ordered corrective action or taken

70

other steps had it known what was afoot at Indian Path, but relator has put nothing on the record to suggest that the government would not have reimbursed for UB-92s that were, at least based on the evidence presented, factually correct.

The False Claims Act does not "create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *see also United States ex rel. Capella v. Norden Systems, Inc.*, 2000 U.S. Dist. LEXIS 13352 at *24 (D.Conn. 2000) ("a violation of a statute or regulation does not, by itself, trigger FCA liability because it is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.") (internal quotation omitted).

The Court thus concludes that a UB-92 form which does not misstate the services rendered is not converted into a false claim simply because the claimant is committing other fraudulent conduct at the same time as the claim is submitted.  This conclusion is supported by the logic of *Visiting Nurse Association of Brooklyn v. Thompson*, 378 F.Supp. 2d 75 (E.D.N.Y. 2005), which held under substantially similar facts that the submission of an otherwise factually accurate UB-92 did not constitute submission of a false claim simply because of underlying fraud at the healthcare facility.

To state the facts of *Visiting Nurse* in short form, a healthcare facility engaged in something similar to TEFRA-rate inflation, submitting cost reports that overstated its costs and thus set inflated reimbursement rates for the coming year.  The government sought to collect statutory penalties for each of the UB-92 forms submitted in the year after the cost reports were

71

falsified.  The court ruled that, because there was "no allegation that any aspects of the reimbursement claims themselves were false or fraudulent," it was "too great a stretch to say these reimbursement claim forms were false or fraudulent because, and only because, the Providers' cost reports were false."  *Id.* at 99.  The application of that logic to this case is even more compelling, for in *Visiting Nurse* the UB-92s were submitted *after* the false cost reports, meaning that the UB-92s at issue sought reimbursement at a rate that was knowingly inflated.  At least in that case, there was an argument that the forms sought money to which the claimant was not entitled.  In this case, the UB-92s at issue sought reimbursement at an interim rate that negotiated at arms-length, and as the Court has stated, there is no evidence that the forms billed the government for services that were not actually rendered or necessary.  As to each UB-92, the government got what it paid for.

Where, as here, a relator fails to "point to a single, specific false claim or a sufficiently detailed description of one, he failed to create a triable issue of fact."  *United States ex rel. Aflatooni v. Kitsap Physicians Service*, 314 F.3d 995, 997 (9th Cir. 2002).  This by no means condones what allegedly was going on at Indian Path during the time the UB-92s were submitted.  If the facts are as alleged, a fraud was in the process of being perpetrated.  But that fraud was not truly consummated until the cost report was submitted.  It is the cost report that contained the false statements, did the damage, and completed the fraud.  Even on the broadest reading given to the FCA, that it "reaches beyond demands for money that fraudulently overstate an amount otherwise due; it extends 'to all fraudulent attempts to cause the Government to pay out sums of money,'" *Ab-Tech* at 433 (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)), the fraudulent demand in this case is the cost report, not the individual UB-92.  The FCA is not a

catchall anti-fraud provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot. *Aflatooni*, 314 F.3d at 1002 ("The False Claims Act, then, focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme.").

The Court thus finds that the liability of Columbia/HCA and Horizon for any FCA violations at Indian Path cannot be resolved at the summary judgment stage. As to statutory penalties for the UB-92s, relator has brought forward insufficient evidence that the GP unit made any patient stay longer than necessary, and cannot prevail on a claim that the UB-92s were rendered false by other fraud occurring at Indian Path, and thus partial summary judgment in favor of all defendants is granted as to liability for statutory penalties for the UB-92s.[34]

## VII. CONCLUSION

For the foregoing reasons, the motion [1191] to amend the briefing schedule is DENIED as moot; the motion [1216] to file a surreply is GRANTED; the motion [1224] to strike or for leave to file a surreply is DENIED in part and GRANTED in part, insofar as the Court will not strike the reply but will grant leave to file the surreply; the motion [1228] for leave to file a

---

[34]In its reply brief in support of its summary judgment motion [1222], Horizon raised a demand for fees and costs. As authority it incorrectly cited to 31 U.S.C. § 3730(g), which applies only where the United States brings the action or intervenes. Prevailing defendants in a declined case may, under 31 U.S.C. § 3730(d)(4), recover attorneys' fees and expenses, but only where "the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." Horizon has not prevailed yet "in the action," and there is no evidence that this suit was brought solely for vexatious purposes or that it is "bereft of any objective factual support," and so no fee award is appropriate at this time. *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001).

surreply is DENIED; the motion [1147] for suggestion of remand is DENIED; and the motion [1187] to stay briefing is DENIED.

The motion [1200] by the Columbia group of defendants to dismiss for lack of subject matter jurisdiction is GRANTED.  All claims against the Columbia group of defendants for conduct at locations other than the Indian Path hospital are dismissed.  The motion [1182] by Horizon to dismiss for lack of subject matter jurisdiction is DENIED as moot, the parties having stipulated that Horizon is not a subject of allegations which are not related to conduct at Indian Path.

The motions [1239, 1254] to strike defendants' motions for summary judgment are DENIED, and the motion for leave to file joinder [1237] is GRANTED.  The motion [1218] for summary judgment by Horizon is GRANTED in part and DENIED in part, and the motions [1234, 1235] by the Columbia group of defendants is GRANTED in part and DENIED in part. These motions are GRANTED insofar as the Court grants summary judgment in favor of defendants on liability for statutory penalties under the False Claims Act for the 66 UB-92 forms at issue in this case; relator has not presented evidence of their falsity, under any theory, that is sufficient to survive summary judgment.  The motions are denied in all other respects.

As previously stated, a transferee court conducting pretrial proceedings has the power to issue a final pretrial order, *In re Rhone-Poulenc Rorer*, 138 F.3d at 697, and the Court finds that its experience with the facts and legal theories in this case leave it best situated to ensure that the remaining pretrial proceedings proceed efficiently and in a manner that is well coordinated with the prior proceedings in this case and the other MDL cases.  The parties are thus ordered to

submit to the Court by September 4, 2007 a joint pretrial statement in accordance with Local

Civil Rule 16.5(d)(5).  A pretrial conference will be scheduled for late September, where the

Court and parties can craft a final pretrial order and discuss the prospects of settling this case.

A separate order shall issue this date.

SO ORDERED.

Signed by United States District Judge Royce C. Lamberth, July 17, 2007.